# REAGAN *v.* FARMERS' LOAN AND TRUST COMPANY.

**APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.**

No. 928. Argued April 4, 5, 1894. — Decided May 26, 1894.

Without passing upon the validity of the 5th and 14th sections of the act of the legislature of Texas of April 3, 1891, establishing a railroad commission with power to classify and regulate rates, the remainder of the act is a valid and constitutional exercise of the state sovereignty, and the commission created thereby is an administrative board, created for carrying into effect the will of the State, as expressed by its legislation.

A citizen of another State who feels himself aggrieved and injured by the rates prescribed by that commission may seek his remedy in equity against the commissioners in the Circuit Court of the United States in Texas, and the Circuit Court has jurisdiction over such a suit under the statutes regulating its general jurisdiction, with the assent of Texas, expressed in the act creating the commission.

Such a suit is not a suit against the State of Texas.

It is within the power of a court of equity in such case to decree that the rates so established by the commission are unreasonable and unjust, and to restrain their enforcement; but it is not within its power to establish rates itself, or to restrain the commission from again establishing rates.

On April 3, 1891, the legislature of the State of Texas passed an act to establish a railroad commission. The first section provides for the appointment and qualification of three persons to constitute the commission; the second for the organization of the commission, while the third defines the powers and duties of the commission, and is as follows:

" SEC. 3. The power and authority is hereby vested in the railroad commission of Texas, and it is hereby made its duty, to adopt all necessary rates, charges, and regulations to govern and regulate railroad freight and passenger tariffs, the power to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and to enforce the same by having the penalties inflicted as by this act prescribed through proper courts having jurisdiction.

" (a) The said commission shall have power, and it shall be its duty, to fairly and justly classify and subdivide all freight and property of whatsoever character that may be transported over the railroads of this State into such general and special classes or subdivisions as may be found necessary and expedient.

" (b) The commission shall have power, and it shall be its duty, to fix to each class or subdivision of freight a reasonable rate for each railroad subject to this act for the transportation of each of said classes and subdivisions.

" (c) The classifications herein provided for shall apply to and be the same for all railroads subject to the provisions of this act.

" (d) The said commission may fix different rates for different railroads and for different lines under the same management, or for different parts of the same lines if found necessary to do justice, and may make rates for express companies different from the rates fixed for railroads.

" (e) The said commission shall have power, and it shall be its duty, to fix and establish for all or any connecting lines of railroad in this State reasonable joint rates of freight charges for the various classes of freight and cars that may pass over two or more lines of such railroads.

" (f) If any two or more connecting railroads shall fail to agree upon a fair and just division of the charges arising from the transportation of freights, passengers or cars over their lines, the commission shall fix the pro rata part of such charges to be received by each of said connecting lines.

" (g) Until the commission shall make the classifications and schedules of rates as herein provided for, and afterwards if they deem it advisable, they may make partial or special classifications for all or any of the railroads subject hereto, and fix the rates to be charged by such roads therefor; and such classifications and rates shall be put into effect in the manner provided for general classifications and schedules of rates.

" (h) The commission shall have power, and it shall be its duty from time to time, to alter, change, amend, or abolish

any classification or rate established by it when deemed necessary; and such amended, altered, or new classifications or rates shall be put into effect in the same manner as the originals.

"(*i*) The commission may adopt and enforce such rules, regulations, and modes of procedure as it may deem proper to hear and determine complaints that may be made against the classifications or the rates, the rules, regulations, and determinations of the commission.

"(*j*) The commission shall make reasonable and just rates of charges for each railroad subject hereto for the use or transportation of loaded or empty cars on its road; and may establish for each railroad or for all railroads alike reasonable rates for the storing and handling of freight and for the use of cars not unloaded after forty-eight hours' notice to the consignee, not to include Sundays.

"(*k*) The commission shall make and establish reasonable rates for the transportation of passengers over each or all of the railroads subject hereto, which rates shall not exceed the rates fixed by law. The commission shall have power to prescribe reasonable rates, tolls, or charges for all other services performed by any railroad subject hereto."

The first paragraph of the fourth section is in these words:

"SEC. 4. Before any rates shall be established under this act, the commission shall give the railroad company to be affected thereby ten days' notice of the time and place when and where the rates shall be fixed; and said railroad company shall be entitled to be heard at such time and place, to the end that justice may be done; and it shall have process to enforce the attendance of its witnesses. All process herein provided for shall be served as in civil cases."

The remaining paragraphs give power to adopt rules of procedure. The fifth, sixth, and seventh sections are as follows:

"SEC. 5. In all actions between private parties and railway companies brought under this law, the rates, charges, orders, rules, regulations, and classifications prescribed by said commission before the institution of such action shall be held conclusive, and deemed and accepted to be reasonable, fair,

and just, and in such respects shall not be controverted therein until *finally found* otherwise in a direct action brought for that purpose in the manner prescribed by sections 6 and 7 hereof.

"Sec. 6. If any railroad company or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act, or regulation adopted by the commission, such dissatisfied company or party may file a petition setting forth the particular cause or causes of objection to such decision, act, rate, rule, charge, classification, or order, or to either or all of them, in a court of competent jurisdiction in Travis County, Texas, against said commission as defendant. Said action shall have precedence over all other causes on the docket of a different nature, and shall be tried and determined as other civil causes in said court. Either party to said action may appeal to the appellate court having jurisdiction of said cause, and said appeal shall be at once returnable to said appellate court, at either of its terms, and said action so appealed shall have precedence in said appellate court of all causes of a different character therein pending : *Provided,* That if the court be in session at the time such right of action accrues, the suit may be filed during such term and stand ready for trial after ten days' notice.

"Sec. 7. In all trials under the foregoing section the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, orders, classifications, acts, or charges complained of are unreasonable and unjust to it or them."

Sections 8, 9, 10, 11, 12, and 13 contain special provisions which are not material to the consideration of any question presented in this case.

Section 14 reads :

"Sec. 14. If any railroad company subject to this act, or its agent or officer, shall hereafter charge, collect, demand or receive from any person, company, firm, or corporation a greater rate, charge, or compensation than that fixed and established by the railroad commission for the transportation of freight, passengers, or cars, or for the use of any car on

the line of its railroad, or any line operated by it, or for receiving, forwarding, handling, or storing any such freight or cars, or for any other service performed or to be performed by it, such railroad company and its said agent and officer shall be deemed guilty of extortion, and shall forfeit and pay to the State of Texas a sum not less than $100 nor more than $5000."

Section 15 defines unjust discrimination, and imposes a penalty of not less than $500 nor more than $5000 upon any railroad company violating any provision of the section.

Section 16 is levelled against officers and agents of railroads, and imposes a penalty of not less than $100 nor more than $1000 for certain offences denounced therein.

Section 17 declares that any railroad company violating the provisions of the act shall be liable to the persons injured thereby for the damages sustained in consequence of such violation, and in case it is guilty of extortion or discrimination, as defined in the act, shall pay, in addition to such damages to the person injured, a penalty of not less than $125 nor more than $500.

In sections 18 and 19 are further provisions as to penalties. The remaining sections, 20 to 24, inclusive, contain matter of detail which is unimportant in this case.

Three of the plaintiffs in error, Reagan, McLean, and Foster, were duly appointed and qualified as members of said railroad commission, and organized it on the 10th day of June, 1891. The other plaintiff in error, Culberson, is the attorney general of the State, who, by section 19 of the act, was charged with the duty of instituting suits in the name of the State for the recovery of all the penalties prescribed by the act, excepting those recoverable by individuals under the authority of section 17.

After the commission had organized on June 10, it proceeded to establish certain rates for the transportation of goods over the railroads in the State, and also certain regulations for the management of such transportation. Thereafter, on April 30, 1892, the Farmers' Loan and Trust Company filed its bill in the Circuit Court of the United States for the Western District

of Texas, making as defendants the railroad commissioners, the attorney general, the International and Great Northern Railroad Company, and Thomas M. Campbell, the receiver thereof, duly appointed by the District Court of Smith County, Texas. That bill, which is too long to be copied in full, alleged that the plaintiff was the trustee in a trust deed executed by the railroad company on the 15th day of June, 1881, to secure a second series of bonds, aggregating $7,054,000, bearing interest at the rate of 6 per cent per annum ; and that there was a prior issue of bonds to the amount of $7,954,000, secured by a conveyance to John S. Kennedy and Samuel Sloan, as trustees. It then set forth the railroad commission act heretofore referred to, or so much thereof as was deemed material, the proceedings of the commission, and the notices that were given to the railroad company, and attached as exhibits the several orders prescribing rates and regulations. It also averred generally that such rates were unreasonable and unjust, set forth certain specific facts which it claimed established the injustice and unreasonableness of those rates, and prayed a decree restraining the commission from enforcing those rates, or any other rates, and also restraining the attorney general from instituting any suits to recover penalties for failing to conform to such rates and obey such regulations. The International and Great Northern Railroad Company appeared, filed an answer and also a cross-bill similar in its scope and effect to the bill filed by the plaintiff, and praying substantially the same relief. The railroad commission and the attorney general at first filed answers, but, after a certain amount of testimony had been taken, (of the nature and extent of which we are not advised, inasmuch as it is not preserved in the record,) they withdrew their answers and filed demurrers, leave being given at the same time to the complainant and cross-complainant to amend the bill and cross-bill before the filing of the demurrer. The amendments to the bill and cross-bill were similar, and contained allegations more in detail of the losses in revenue sustained by the company through the enforcement of the tariffs, and the average reduction caused by such tariffs in the rate theretofore exist-

ing; and also setting forth certain contract rights under an act of the legislature of the State of Texas, passed on February 7, 1853. Thereafter the cause was submitted to the court on the bills and cross-bills and demurrers, and on March 23, 1893, a decree was entered in favor of the plaintiff as follows:

"This cause having been set down for final hearing on the pleadings and evidence, and being called for hearing thereon, the defendants John H. Reagan, William P. McLean, L. L. Foster, and Charles A. Culberson presented their motion, on file herein, for leave to withdraw their answers and file demurrers, which motion was granted conditioned upon the said defendants paying all costs of taking depositions and evidence, herein against them to be taxed, and for which execution may issue, and on condition that the complainant and cross-complainant have leave to amend before the filing of the demurrers of the said defendants, which leave was granted, and whereupon said amendments were filed, and the demurrers of the said defendants were filed to the original bill of complaint and cross-bill in this cause, as also to all amendments thereto, and were, by complainant and cross-complainant, set down for argument by consent, and were by all parties forthwith submitted; and thereupon, in consideration thereof, it was ordered, adjudged, and decreed that said demurrers be, and the same are hereby, overruled; and the defendants John H. Reagan, William P. McLean, L. L. Foster, and Charles A. Culberson having entered of record their refusal to make further answer, and the fact that they stood upon their demurrers, and all parties submitting the cause for final decree, it is now, upon consideration thereof, ordered, adjudged, and decreed that the bill of complaint as amended, and the cross-bill of complainant as amended, in the above-entitled cause, be, and the same are hereby, sustained and taken for confessed. And the said cause coming on further to be heard upon the bill of complaint herein as amended, and upon the answer of the defendant railroad company thereto, confessing the same, it is further ordered, adjudged, and decreed as follows, to wit:

"First. That the injunctions heretofore issued in this

cause be, and the same are hereby, made perpetual, and accordingly.

"Second. That defendant, the International and Great Northern Railroad Company be, and it is hereby, perpetually enjoined, restrained, and prohibited from putting or continuing in effect the rates, tariffs, circulars, or orders of the railroad commission of Texas, or either or any of them, as described in the bill of complaint herein and in 'Exhibit C' thereto and therewith filed, and from charging or continuing to charge the rates specified in said tariffs, circulars, or orders, or either or any of them.

"Third. It is further ordered, adjudged, and decreed that the defendants, the railroad commission of Texas and the defendants, John H. Reagan, William P. McLean, and L. L. Foster, acting as the railroad commission of Texas, and their successors in office, and the defendant, Charles A. Culberson, acting as attorney general of the State of Texas, and his successors in office, be, and they are hereby, perpetually enjoined, restrained, and prohibited from instituting or authorizing or directing any suit or suits, action or actions, against the defendant railroad company for the recovery of any penalties under and by virtue of the provisions of the act of the legislature of the State of Texas, approved April 3, 1891, and fully described in the bill of complaint; or under or by virtue of any of the said tariffs, orders, or circulars of the said railroad commission of Texas, or any or either of them, or under or by virtue of the said act and the said tariffs, orders, or circulars of said railroad commission, or any or either of them combined, and said defendants Reagan, McLean, and Foster and the railroad commission of Texas are further perpetually restrained from certifying any copy or copies of any of said orders, tariffs, or circulars, or from delivering, or causing or permitting to be delivered, certified copies of any of said orders, tariffs, or circulars to the said Culberson or any other party, and from furnishing the said Culberson, or any other party, any information of any character for the purpose of inducing, enabling, or aiding him or any other party to institute or prosecute any suit or suits against the said defendant

railroad company for the recovery of any penalty or penalties under the said act.

"Fourth. It is further ordered, adjudged, and decreed that the said railroad commission of Texas and the said Reagan, McLean, and Foster be perpetually enjoined, restrained, and prohibited from making, issuing, or delivering to the said railroad company, or causing to be made, issued, or delivered to it, any further tariff or tariffs, circular or circulars, order or orders.

". "Fifth. It is further ordered, adjudged, and decreed that all other individuals, persons, or corporations be, and they are hereby, perpetually enjoined, restrained, and prohibited from instituting or prosecuting any suit or suits against the said railroad company for the recovery of any damages, over-charges, penalty, or penalties, under or by virtue of the said act or any of its provisions, or under and by virtue of the said tariffs, orders, or circulars of the said railroad commission of Texas, or any or either of them, or under and by virtue of the, said act and the said tariffs, orders, and circulars, or any or either of them combined.

"Sixth. It is further ordered, adjudged, and decreed that all rates, tariffs, circulars, and orders heretofore made and issued by said commission, and fully described in 'Exhibit C' to the bill of complaint herein, be, and they are hereby, declared to be unreasonable, unfair, and unjust as to complainant and cross-complainant, and they are hereby cancelled and declared to be null, void, and of no effect.

"Seventh. It is further ordered, adjudged, and decreed that all costs herein be taxed against said defendants Reagan, McLean, Culberson, and Foster and the railroad commission of Texas, and that execution may issue therefor."

From that decree the railroad commission and the attorney general have appealed to this court.

*Mr. Charles A. Culberson*, Attorney General of the State of Texas, for appellants, to the point that the suit was against the State of Texas, said:

This being a suit by a citizen of the State of New York

against the Attorney General and the Railroad Commission, it is in effect a suit against the State of Texas, and is inhibited by the eleventh amendment to the Constitution of the United States.

(1) It must now be accepted as settled law that a suit by a citizen against the attorney general of one of the States of the Union in his official capacity is prohibited by this amendment, if the law under which he purports to do the act complained of is valid and constitutional. Assuming the validity of the commission law for present purposes, it follows that the proceedings and decree against the attorney general are void. This is true whether the law is valid in its entirety or with the exception of section 5, because in suits by the attorney general in the name of the State the justness of the rates may be inquired into. *In re Ayers*, 123 U. S. 443; *Pennoyr* v. *McConnaughy*, 140 U. S. 1, 10; *In re Tyler*, 149 U. S. 16½, 190, 191.

As the injunction is sought against the attorney general solely for the purpose of arresting proceedings in the state courts in the name of the State alleged to be contemplated by him, the suit is expressly forbidden by statute. That the law under which he proposes to act may be invalid is not material. Rev. Stat. § 720; *Rensselaer & Saratoga Railroad* v. *Bennington & Rutland Railroad*, 18 Fed. Rep. 617.

It is not urged that the attorney general can take part in the establishment of rates, or in any other manner is interfering with the property of the railroad company, or contemplating any other act save the institution of suits in which the company may, under the theory of complainant, contest in the courts the reasonableness of the rates fixed by the commission. It is only in suits instituted by private parties that the law makes the rates conclusively reasonable until otherwise determined in a direct action. In every action authorized to be brought by the attorney general the defence that the rates are unreasonable may be interposed. Under such conditions the language of Mr. Justice Field in the case where it was attempted to enjoin the attorney general of Virginia from instituting suits in the name of that Commonwealth is

particularly pertinent : " There is a wide difference between restraining officers of the State from interfering in such cases with the property of the citizen, and restraining them from prosecuting a suit in the name of the State in her own courts to collect an alleged claim. Her courts are at all times as open to her for the. prosecution of her demands as they are open to her citizens for the prosecution of their claims." *In re Ayers*, 123 U. S. 509 ; *Mc Whorter* v. *Pensacola & Atlantic Railroad*, 24 Florida, 417.

(2) Still assuming the validity of the law, the suit as to the railroad commission is in effect against the State, and therefore prohibited. I am aware that in some cases (*Mc Whorter* v. *Pensacola &c. Railroad*, 24 Florida, 417; *Chicago & Northwestern Railroad* v. *Dey*, 35 Fed. Rep. 866, 870 ; *Chicago & St. Paul Railway* v. *Becker*, 35 Fed. Rep. 883, 885 ; *Richmond & Danville Railroad* v. *Trammel*, 53 Fed. Rep. 196) it is denied generally that suits against a railroad commission are suits against the State, but the application of principles announced in the best considered of them will sustain our contention. In the *Florida case*, it is said " that the rule which forbids a suit against officers, because in effect a suit against the State, applies only where the interest of the State is *through some contract* or some property right of hers, or where her interest is in a suit brought or threatened by her officers, in her own name, to enforce some alleged claim of hers." In the *Dey case* Judge Brewer said : " And in all the cases in which, where the State was not a party to the record, and yet the judgment of the Supreme Court was that it was a real party in interest, and therefore the Federal court without jurisdiction, it will, I think, be found that some *contract of the State* was the foundation of the litigation, and that those suits, though nominally against state officers, were construed by that court as in fact suits to compel performance by the State of its contract, or to prevent it from carrying into effect measures intended to work a repudiation." Here both the complainant and cross-complainant allege that the law passed the 7th day of February, 1854, " entered into and formed a part of the charter contract between said railway company, the

State of Texas, and the bondholders aforesaid," and this is in effect a suit to restrain the State of Texas, through the commission, from violating the alleged contract by establishing rates which will yield less revenue than that authorized by the act of 1854. It is also said in these opinions that to constitute suits against the State, when its officers are the nominal defendants, the State must have a pecuniary interest involved. Such is this case. The commission law provides penalties for its violation, directs in sections 19 and 21 thereof that the commission shall cause them to be recovered and that they shall be paid into the treasury of the State. The right to these penalties is a property right; they are debts and demands due the State by the companies, and to restrain the commission and the attorney general from recovering them is a denial of the right of the State to collect its debts and reduce its property to possession.

But the principle of these cases, it is submitted, is too narrow. They lay down the rule that suits, though against officers through whom alone it may perform its sovereign functions, are not against the State unless a contract with the State is involved in the litigation or unless the State has a property interest in the controversy. Such a construction is destructive of the larger purpose of the Eleventh Amendment. From its terms and history it is clear that this purpose was to protect the State against Federal judicial interference with its administrative affairs as well as with its mere property rights. It is thereby declared that the " judicial power shall not be construed to extend to *any* suit in law or equity " against a State by a citizen of another State. The character of the suit is immaterial (1 Kent Com. 297). The inhibition attaches if by the decree the property rights of the State may be affected or if the State through its officers may be compelled to do or abstain from doing any act in its governmental capacity. It is inconceivable that the people of the United States, at that period intensely watchful and jealous of the rights of the States, intended by this broad and comprehensive amendment to protect the States against judicial interference with their property and leave unprotected the vital, undelegated powers of government.

By the Constitution, as originally adopted, the judicial power of the United States did not extend to controversies between a State and its own citizens; nor does it now. It only extended to controversies "between a State and citizens of another State." This court, however, decided in 1793 that a State could be sued by a citizen of another State. *Chisholm* v. *Georgia*, 2 Dall. 419. This decision produced great concern among the States. Intense feeling was aroused, which led to the adoption of the Eleventh Amendment. As the Constitution then stood suits against the State could not be maintained by their own citizens, and consequently it was only necessary to deny the right to citizens of other States, as was done by the amendment. It is an indisputable truth of history that this amendment was dictated by considerations of state sovereignty and had for its purpose the restoration of state immunity from suit by individuals as it existed prior to the formation of the Union. 2 Hare's Amer. Const. Law, 1055; 1 Bryce, Amer. Comm. 231.

"The adoption of the first eleven amendments to the Constitution, so soon after the original instrument was accepted, shows a prevailing sense of danger at that time from the Federal power. And it cannot be denied that such a jealousy continued to exist with many patriotic men until the breaking out of the late civil war." *Slaughter-house Cases*, 16 Wall. 36, 82; *Davidson* v. *New Orleans*, 96 U. S. 97, 101.

What, then, is this immunity from suit restored by the amendment? Is it limited to mere pecuniary and property rights, or does it extend to those of administration and government? The exemption of the United States and the several States of the Union from being impleaded without their consent is as absolute as that of the Crown of England, *Cohens* v. *Virginia*, 6 Wheat. 264, 411, and "*no* suit or action can be brought against the King even in civil matters, because no court can have jurisdiction over him." 1 Bl. Com. 241.

The foundation of the doctrine shows it to be applicable to governmental affairs. In *Nichols* v. *United States*, 7 Wall. 122, 126, Mr. Justice Davis said: "Every government has an inherent right to protect itself against suits, and if, in the

liberality of legislation, they are permitted, it is only on such terms and conditions as are prescribed by statute. The principle is fundamental, applies to every sovereign power, and, but for the protection which it affords, *the government would be unable to perform the various duties for which it was created.*" In *Briggs* v. *Light Boats,* 11 Allen, 157, 162, Mr. Justice Gray thus stated the rule: " It is an elementary and familiar principle of English and American constitutional law that no direct suit can be brought against the sovereign in his own courts without his consent. In the older books this is often put upon the technical ground that, all judicial writs being in the name of the King as the fountain of justice, the King cannot by his own writ command himself. But the, broader reason is that it would be inconsistent with the very idea of supreme executive power and would endanger the performance of the public duties of the sovereign to subject him to repeated suits as a matter of right, at the will of any citizen, and to submit to the judicial tribunals the control and disposition of his public property, his instruments and means of carrying on the government in war and peace and the money in his Treasury." In the case of *Ayers* Mr. Justice Matthews said: " The very object and purpose of the Eleventh Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties. It was thought to be neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons, whether citizens of other States or aliens, or that the course of their public policy and the administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals without their consent, and in favor of individual interests." *In re Ayers,* 123 U. S. 505.

It thus appears that immunity from suit rests upon the broad ground that suability is incompatible with sovereignty; that but for the rule " the government would be unable to perform the various duties for which it was created;" that

any other rule "would endanger the performance of the public duties" of the State and place under the control of the judiciary "the instruments and means of carrying on the government," and that without it "the course of their public policy and the administration of their public affairs" would be subject to and controlled by the mandates of judicial tribunals. The constitutional amendment adopted by the people of Texas in 1890 and under which the commission law was enacted contains this provision : "The legislature shall pass laws to regulate railroad freight and passenger tariffs, to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and enforce the same by adequate penalties ; and to the further accomplishment of these objects and purposes may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable." No rates were fixed directly by the legislature, but authority to establish rates is vested in the commission. The commission is the agency and means adopted by the legislature to perform the duty enjoined by the Constitution. It is given a superintending authority over the railways of the State, and in effect is directed to take care that the laws relating thereto are faithfully executed. It is required to establish rates, to enforce the same by having the penalties inflicted, to report violations of the law to the attorney general and request prosecutions, to investigate all complaints against railroad companies, and, generally, it may be said, the most important functions of government relating to the establishment and enforcement of rates are entrusted to it. The commission is the representative of the State and within the limits of the law its acts are the acts of the State. The same is true of other state officers in the various divisions of government, and the principle which would extend judicial power over one would finally encompass the whole, and in the end the entire administrative machinery of the State would pass under the control and domination of the judiciary. These proceedings, if sustained, will interfere with or prevent the State from exercising its undoubted power to regulate commerce, one

of the most important functions and duties of government, through the agency of a commission, and it is idle to say that to enjoin the officers through whom alone it can perform these duties, or through whom it lawfully elects to perform them, does not enjoin the State. A construction which places its administrative agencies under the control of the judiciary of a distinct government degrades a State, and is utterly destructive of its independence in all the powers not delegated to the United States and which are reserved to it by the Constitution. Compared with the independent exercise of that "large residuum of sovereignty" remaining in the States, mere property rights are of small consequence, and to narrow the amendment to these would not accomplish the aims and aspirations of its authors or reflect the spirit of their time. They would have repelled the suggestion that their conception and purpose were limited to the lesser consideration of property and took no heed of the autonomy of the States. Their plan contemplated and embraced all of these. What would have been the answer then and what should it be now to the proposition that States may not be sued on contracts or for property, but may be enjoined from exercising the powers and duties of government? What would it avail the States to save their property and lose their independence? Let me not be misunderstood. It is conceded that if the law is void the suit as against the commission is not, under the decisions, against the State. The contention is that the law is constitutional, that the commission in effect and in respect of the powers and duties conferred and enjoined by it is the State, and a suit against it which interferes with the performance of these duties or which wholly restrains such performance is against the State. Any other conclusion, it is submitted, is illogical and indefensible. It is attested by the pronounced theory of this case. The very basis and foundation of the suit, the corner-stone of the complaint, is that the State, through the commission, is depriving the trustee of property without due process of law, in violation of the Fourteenth Amendment; for this amendment, in declaring "Nor shall any State deprive any person of life, liberty, or property without due process of law," is levelled

only against state action, and is not infringed unless the State is the actor. An injunction against the commission under that amendment is necessarily against the State, because if the commission does not act for the State the amendment is not violated. "To secure the manifest purposes of the constitutional exemption guaranteed by the Eleventh Amendment requires that it should be interpreted, not literally and too narrowly, but fairly, and with such breadth and largeness as effectually to accomplish the substance of its purpose. In this spirit it must be held to cover, not only suits brought against a State by name, but those also against its officers, agents, and representatives, where the State, though not named as such, is, nevertheless, the only real party against which alone in fact the relief is asked, and against which the judgment or decree effectively operates." *In re Ayers*, 123 U. S. 505, 506.

*Mr. John F. Dillon* and *Mr. E. B. Kruttschnitt*, (with whom were *Mr. Herbert B. Turner* and *Mr. John J. McCook* on the brief,) for appellee, upon the effect of the Fourteenth Amendment upon the power of the States to regulate and control railway fares and charges, said:

The underlying question in this case is whether at this time, railway companies and the holders of their shares and bonds have any effectual protection against legislative invasion and destruction of the values of their properties. In 1891 the legislature of Texas passed a railroad commission act, which empowers three citizens of Texas who, by the appointment of the governor, constitute the commission, to fix rates for railway transportation, and provides that the rates so fixed shall be in all cases presumptively, and in certain cases conclusively, reasonable and lawful.

It enacts that if any railway company shall charge or receive a greater rate than that fixed and established by the commission, it shall be guilty of extortion and liable to double penalties, one to the State and one to the passenger or shipper, ranging from $100 to $5000 for each offence. Under the authority of this act the commission have, as alleged, both

generally and circumstantially, in the bill and amended bill of complaint, fixed tariffs of rates which are unreasonable and unjust, and have coerced the companies to put these rates into effect under the menaces contained in the act of a vast multiplicity of suits to enforce the provisions thereof as to damages and penalties.

The shareholders and the bondholders, as well as the railway companies, are remediless unless they can obtain judicial relief. And they can obtain no such relief in this and the like causes unless the act itself, or the orders of the commission establishing such rates, are in conflict with the act or with the provisions of the constitution of the State, or of those provisions of the Constitution of the United States, which protect private property from state legislative spoliation, and which guarantee to every person the equal protection of the laws of the land.

The founders of our democratic, or rather republican institutions were neither visionaries nor socialists. It is among the eternal lessons of history, which they well knew, that the mass of the people were subject to the influence of supposed temporary interests, and of "violent and casual forces" which might be in conflict with their own vital and permanent welfare. Realizing this truth, and the necessity of safe-guarding these vital and permanent interests, the founders of our political and legal institutions devised — and the device has been supposed to be the crowning proof of their wisdom — the American polity of constitutional restraints upon all the departments of the governments which the people established. All the original States undertook to secure the inviolability of private property. This they did, either by extracting and adopting, in terms, the famous 39th article of Magna Charta, securing the people from arbitrary imprisonment and arbitrary spoliation, or by claiming for themselves, compendiously, all of the liberties and rights set forth in the Great Charter. We make this statement as to the action of the original States after a careful examination of their charters and constitutions.

When the Federal constitution was formed, there was in-

serted in it the provision, also original and unique, "that no State shall pass any law impairing the obligation of contracts."

Encroachments from the general government were feared, and this fear led to the speedy adoption of the first amendments to the constitution. Justice Miller, in the *Slaughterhouse cases* says: "The adoption of the first eleven amendments to the Constitution, so soon after the original instrument was accepted, shows prevailing sense of danger at that time from the Federal power."

The Fifth Amendment was borrowed from the Magna Charta, where it had stood for more than five centuries as the bulwark of the ancient and inherited rights of Englishmen to be secure in their personal liberty and in their possession. It was a limitation only on the general government; but it showed a settled purpose, from the beginning, in both State and Federal constitutions to protect and secure personal liberty and private property.

With these guarantees — the inviolability of contracts and the sacredness of private property — the Republic set out on its untried course. One hundred years and more have vindicated the necessity and the wisdom of these organic limitations.

The result of the provision ordaining contracts to be inviolable has been, says Mr. Justice Miller, "to make void innumerable acts of state legislatures intended in times of disastrous financial depression and suffering to protect from the hardships of a rigid and prompt enforcement of the law in regard to their contracts, and to prevent the States from repealing, abrogating, or avoiding by legislation, contracts fairly entered into with other parties." Miller on Const. 393.

Hundreds of acts of state legislation have been declared void under this clause by this court, and attempted repudiation, with its consequent dishonor, prevented. Who is not glad that the States have not the power to destroy or impair contracts?

So, likewise, the provisions in the state and national constitutions protecting private property have, up to this time,

been effective. These have been, indeed, the great triumphs of our popular system of government, for these were supposed to be its vulnerable spots. Disbelievers in republican institutions had predicted early shipwreck on these rocks, and when it came not they simply postponed the period of fulfilment.

The history and general purpose of the Thirteenth, Fourteenth, and Fifteenth Amendments are set forth in the *Slaughter-house cases* and in other cases decided by this court. We have no occasion to offer any specific criticism on these decisions; for, so far as concerns the question of state power over railway rates, a review of all the cases on this subject from *Munn* v. *Illinois* and the *Granger cases*, decided in 1876, to the *Michigan Passenger Rate case*, decided in 1892, establishes the doctrine that the States have the power to regulate rates, but that such power must be exercised subject to the prohibitions of the Fourteenth Amendment, and, if the regulations thus made are unreasonable, they are void; and the question whether or not they are unreasonable is a judicial question, to be determined by the courts in suits commenced and conducted therein, under and in accordance with the laws of the land.

We contend for nothing more. As thus understood, the doctrine is, as we believe, just and sound.

We must say, however, that it has seemed to us that the principles and purpose of the Fourteenth Amendment have not always been appreciated to the full. We agree that it was not intended to effect structural changes as between the state and Federal governments, but we do not agree that its language or scope are to be limited by the special causes which occasioned its adoption.

It may be that the oppressions of the freedmen by the States in which they had been slaves was the immediate cause of the amendment, but its language is not confined to color or to class. It is general and unlimited. Motley expresses a great truth when he says: "So close is the relationship of the whole human family that it is impossible for a nation, even when struggling for itself, not to acquire something for all mankind." Preface to Dutch Republic. And it is the special glory of those who framed and secured this amendment that

they purposely made its language and provisions universal and undistinguishing in their application. It is, in fact, a reaffirmation, in the most impressive and solemn form, of the sacredness and stability of private property, as one of the fundamental and indestructible rights of the people of the United States.

Thus it is effectual to protect railway properties against any action or legislation of the States, the effect of which is to deprive the companies of a right to a reasonable compensation for services in the transportation of freight or passengers. In this aspect the question of what is a reasonable compensation is a judicial question to be determined in the courts.

The Texas Railroad Commission Act, in respect of fixing and enforcing rates of charges, is in violation of the Constitution of the United States, for the reason that provisions of the Texas act in that behalf not only limit but effectually deny to railway companies subject to the act, the right to a judicial inquiry into the reasonableness of the rates fixed by the commission, and thereby deny to the companies the equal protection of the laws; and if the Texas act is enforced in the manner provided therein, (and it cannot, of course, be otherwise enforced,) it deprives the companies of their property without due process of law.

We understand and maintain that the decisions of this court on the subject of the power of the States over railway tariffs or charges establish the following principles :

As to railways created by a State, or doing business in a State under state authority, the result of the decisions of this court is that, as to interstate commerce, the several States are without any authority whatever to touch or regulate the same in any degree. As to domestic commerce — that is, such as " begins and ends within a State, disconnected from a continuous transportation through or into other States," *Wabash &c. Railway* v. *Illinois,* 118 U. S. 557, 564 — the State may establish maximum rates of charges, either immediately by legislative act or mediately through a commission, but this power is not unlimited : like all other legislative powers, it is subject to the prohibitions of the Constitution of the United States, and particularly to those of the Fourteenth Amend-

ment. The constitutional limitation is that the rates thus fixed, although they are *prima facie* valid, because presumptively reasonable, are nevertheless void if the carrier affected thereby can establish in a proper judicial proceeding that they are · unreasonable. The question of reasonableness or. unreasonableness is in all cases "ultimately a judicial question, requiring due process of law for its determination "— that is, judicial investigation in a suit in the courts of justice " under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy." It is not competent, therefore, for the State to enact that the rates fixed by a commission, whether *ex parte* or after notice and investigation are conclusive or final, for such an act would be unconstitutional, since it denies to the company due process of law, and, by depriving it of the lawful use of its property deprives it of the property itself, and of the equal protection of the laws. *Chicago, Milwaukee &c. Railway* v. *Minnesota,* 134 U. S. 418, 458. As the result of all this we contend (*a*) that the provisions of the Texas Railroad Commission act as to fixing and enforcing rates are unconstitutional; and (*b*) that the complainants are entitled, on the averments in the bill and the amended bill, to an injunction and decree against the enforcement of those rates.

The justice of this contention will be shown by an examination of the decisions of this court on the subject of the extent of legislative power over railway tariffs.

The earliest decisions were in *Munn* v. *Illinois,* and what are known as the *Granger cases.* These cases were decided in 1876, and are reported in 94 U. S. 113; 155–180.

In each of the cases the state legislatures had fixed a maximum rate. The elevator owner and the railway companies denied the existence of any such power in the States. This was the great overshadowing question, and the one to which the attention of the court was given, and the one which was adjudged. The judgment was that such a power existed, but the scope and extent of the power were not determined, for the cases did not require it.

In 1883, the general question of the scope of state legislative power, under special provisions of the state constitution and statutes, to fix rates for a public water supply came before the court in a case from California.

The case of *Spring  Valley  Water  Works* v. *Schottler*, 110 U. S. 347 (1883), above referred to, was this:

The Spring Valley Water Works Company was incorporated under the General Incorporation act of the State of California, and under a constitution which provided that all laws passed might be from time to time altered and repealed.  The act under which the company was incorporated provided that rates for water should be fixed by a board of commissioners to be appointed in part by the corporation and in part by the municipal authorities.  Afterwards the constitution and laws were changed so as to take away from the corporations which had been organized and put into operation under the old constitution and laws, the power to name members of the boards of commissioners, and so as to place in the municipal authorities the sole power of fixing rates for water.  The precise and sole point decided was that these changes did not violate any provisions of the Constitution of the United States.  There was no question in the record *as to the reasonableness of rates fixed for water*.  This is most material.

The next case in the order of time bearing upon the subject is the *Wabash Railway case*, entitled *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 118 U. S. 557 (1886).

In this case the Wabash Railway Company charged Elder & McKinney for transporting a carload of goods from Peoria, Illinois, to New York City, $39, being at the rate of 15 cents per hundred pounds for said carload.  On the same day the said company charged Bailey & Swannell on another carload of goods from Gilman, Illinois, to New York City, $65, being at the rate of 25 cents per hundred pounds, though the carload transported for Elder & McKinney was carried 86 miles further in the State of Illinois than the other.  The Supreme Court of Illinois held that this was an unjust discrimination, and violated the Illinois statute which prohibited unjust discriminations.  The Supreme Court of the United States

reversed this judgment, and held that these shipments were commerce among the States, the regulation of which is confided *exclusively* to Congress, and that such transportation was not in any degree or to any extent subject to regulation by the State; and that the statute of Illinois as applied to any part of such shipments — even the part of the distance within the State of Illinois — was forbidden by the Constitution of the United States.

In the next year there came before the court the Arkansas case of *Dow* v. *Beidelman*, 125 U. S. 680 (1887). Here it appeared that the Memphis and Little Rock Railroad Company had been recently reorganized, and there was no proof of the amount of the capital invested in the reorganized company, or the amount of its capital stock, or the price paid by such reorganized company for the road. The State passed an act fixing in the act itself three cents a mile as the maximum fare for carrying passengers. There was *no proof in the case that this was an unreasonable rate*, and the court decided that it could not presume it to be unreasonable, and affirmed the judgment below against Dow, Matthews, and Moran, trustees and owners in possession, for a violation of the state statute fixing a maximum rate of three cents per mile for passenger fare.

This case thus fell within the general principle of the *Granger cases*, viz., that a legislative regulation of fares was presumably reasonable, and, there being no proof to the contrary, the carrier violating the statute would be liable to the penalties denounced by the state enactment.

The next case in order of time in the Supreme Court is the Minnesota case, *Chicago Milwaukee &c. Railway* v. *Minnesota*, 134 U. S. 418 (1889).

The principles established by this case, are that the legislative regulation of fares and rates, whatever its scope, is limited by the line of reasonableness; that if unreasonable they deprive the company of its property without due process of law, and that the question whether they are unreasonable is a judicial question which must be decided in a suit upon pleadings and issues, and upon proofs, (if the facts are controverted,) by the judicial tribunals.

It has been hastily thought by some that the decision of the Supreme Court in the more recent New York Elevator case of *Budd* v. *New York*, 143 U. S. 517 (1891), modified, if it did not overrule, the Minnesota case. But it does not touch or impair in any degree the doctrines of the Minnesota case. It does not profess to do so, and it does not.

The next and latest case in this court is that of the *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339 (1892).

The facts were these : In 1889 the legislature of Michigan passed an act fixing the amount per mile to be charged by railways for the transportation of passengers. The act pro- vided a maximum passenger rate of two cents a mile for rail- roads whose annual gross earnings from passenger business equalled or exceeded $3000 per mile, in which class fell the Chicago and Grand Trunk Railway Company. On the day the law took effect, Wellman, the plaintiff below, went to the railway company's office and tendered $3.20 for a ticket from Port Huron to Battle Creek — that being the rate fixed by the statute — which was refused. He thereupon brought this action in damages under the statute against the railway company. The railway company answered. There were no other parties to the cause. On the trial it was agreed that the company's capital stock was $6,600,000 and had been fully paid in ; that its bonded debt was $12,000,000 at 5 and 6 per cent interest ; that the capital stock and mortgage debt repre- sented the actual amount paid in to the corporation ; that the railroad property was worth more than the capital stock and mortgage debt ; that there was a floating debt of $896,906.40 ; that the entire gross earnings of the company from all sources were absorbed in the payment of operating expenses and in- terest on the indebtedness, and that the stockholders received no dividends whatever. The traffic manager and the treas- urer of the railway company were introduced as witnesses by the company, and testified at the trial that by reason of com- petition with other lines it was impossible to increase their rates without losing their business.

On such agreed statement and testimony, and that alone, the railway company asked an instruction that the Michigan

act referred to was unconstitutional, which the court refused to give. Your Honors said, " The single question presented on the record is whether the trial court, on the facts presented, erred in refusing to instruct, as a matter of law, that the act of 1889 was unconstitutional." The opinion comments on the generality of the facts shown and the omission to show other facts, as, for example, that while it was agreed that the defendant's operating expenses for 1888 were $2,404,516.54, no showing was made of what such operating expenses consisted. The court decided simply that, under these circumstances, it was not error peremptorily to refuse the instruction asked.

*Mr. Alexander G. Cochran, Mr. Winslow S. Pierce,* and *Mr. R. S. Lovell* filed a brief for the International and Great Northern Railroad Company, cross-complainant and appellee.

*Mr. J. W. Terry* and *Mr. George W. Peck* filed a brief in the interest of the Gulf, Colorado and Santa Fé Railroad Company.

*Mr. Henry C. Coke,* (with whom was *Mr. W. S. Simkins* on the brief,) closed for appellants, contending:

I. The act of 1859 did not create any contract between the State of Texas and the railway company, and those interested therein, the obligation of which is impaired by the railway commission law of Texas.

II. The penalties prescribed by the Commission Act for violations thereof were not immoderate, excessive, and contrary to the constitution of Texas.

III. The act does not deny to the railroad company in actions between itself and private parties the right to a trial by jury of the issue of reasonableness or unreasonableness of any rate, rule, regulation, etc., fixed and adopted by the commission, contrary to the constitution of the State of Texas.

IV. The Commission Act does not deny to appellees the equal protection of the laws.

V. The Commission Act does not deprive appellees of

their property without due process of law and without just
compensation.

Mr. Justice Brewer, after stating the case, delivered the
opinion of the court.

The questions in this case are of great importance, and
have been most ably and satisfactorily discussed by counsel
for the respective parties.

We are met at the threshold with an objection that this is
in effect a suit against the State of Texas, brought by a
citizen of another State, and, therefore, under the Eleventh
Amendment to the Constitution, beyond the jurisdiction of
the Federal court.  The question as to when an action against
officers of a State is to be treated as an action against the
State has been of late several times carefully considered by
this court, especially in the cases of *In re Ayers*, 123 U. S.
443, by Mr. Justice Matthews, and *Pennoyer* v. *McCon-
naughy*, 140 U. S. 1, by Mr. Justice Lamar. In the former
of these cases it was said (p. 505):

"To secure the manifest purposes of the constitutional
exemption guaranteed by the Eleventh Amendment requires
that it should be interpreted, not literally and too narrowly,
but fairly, and with such breadth and largeness as effectually
to accomplish the substance of its purpose.  In this spirit it
must be held to cover, not only suits brought against a State
by name, but those also against its officers, agents, and repre-
sentatives, where the State, though not named as such, is,
nevertheless, the only real party against which alone in fact
the relief is asked, and against which the judgment or decree
effectively operates."

And in the latter (p. 9):

"It is well settled that no action can be maintained in any
Federal court by the citizens of one of the States against a State,
without its consent, even though the sole object of such suit
be to bring the State within the operation of the constitu-
tional provision which provides that 'no State shall pass any
law impairing the obligation of contracts.'  This immunity

of a State from suit is absolute and unqualified, and the constitutional provision securing it is not to be so construed as to place the State within the reach of the process of the court. Accordingly, it is equally well settled that a suit against the officers of a State, to compel them to do the acts which constitute a performance by it of its contracts, is, in effect, a suit against the State itself.

"In the application of this latter principle, two classes of cases have appeared in the decisions of this court, and it is in determining to which class a particular case belongs that differing views have been presented.

"The first class is where the suit is brought against the officers of the State, as representing the State's action and liability, and thus making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contracts. *In re Ayers,* 123 U. S. 443; *Louisiana* v. *Jumel,* 107 U. S. 711; *Antoni* v. *Greenhow,* 107 U. S. 769; *Cunningham* v. *Macon & Brunswick Railroad,* 109 U. S. 446; *Hagood* v. *Southern,* 117 U. S. 52.

"The other class is where a suit is brought against defendants who, claiming to act as officers of the State, and under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the State. Such suit, whether brought to recover money or property in the hands of such defendants, unlawfully taken by them in behalf of the State, or for compensation in damages, or, in a proper case where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus, in a like case, to enforce upon the defendant the performance of a plain, legal duty, purely ministerial — is not, within the meaning of the Eleventh Amendment, an action against the State. *Osborn* v. *Bank of the United States,* 9 Wheat. 738; *Davis* v. *Gray,* 16 Wall. 203; *Tomlinson* v. *Branch,* 15 Wall. 460; *Litchfield* v. *Webster County,* 101 U. S. 773; *Allen* v. *Baltimore & Ohio Railroad,* 114 U. S. 311; *Board of Liquidation* v. *McComb,* 92 U. S. 531; *Poindexter* v. *Greenhow,* 114 U. S. 270."

Appellants invoke the doctrines laid down in these two quotations, and insist that this action cannot be maintained because the real party against which alone in fact the relief is asked and against which the judgment or decree effectively operates is the State, and also because the statute under which the defendants acted and proposed to act is constitutional, and that the action of state officers under a constitutional statute is not subject to challenge in the Federal court. We are unable to yield our assent to this argument. So far from the State being the only real party in interest, and upon whom alone the judgment effectively operates, it has in a pecuniary sense no interest at all. Going back of all matters of form, the only parties pecuniarily affected are the shippers and the carriers, and the only direct pecuniary interest which the State can have arises when it abandons its governmental character and, as an individual, employs the railroad company to carry its property. There is a sense, doubtless, in which it may be said that the State is interested in the question, but only a governmental sense. It is interested in the well-being of its citizens, in the just and equal enforcement of all its laws ; but such governmental interest is not the pecuniary interest which causes it to bear the burden of an adverse judgment. Not a dollar will be taken from the treasury of the State, no pecuniary obligation of it will be enforced, none of its property affected by any decree which may be rendered. It is not nearly so much affected by the decree in this case as it would be by an injunction against officers staying the collection of taxes, and yet a frequent and unquestioned exercise of jurisdiction of courts, state and Federal, is in restraining the collection of taxes, illegal in whole or in part.

Neither will the constitutionality of the statute, if that be conceded, avail to oust the Federal court of jurisdiction. A valid law may be wrongfully administered by officers of the State, and so as to make such administration an illegal burden and exaction upon the individual. A tax law, as it leaves the legislative hands, may not be obnoxious to any challenge, and yet the officers charged with the administration of that valid tax law may so act under it in the matter of assessment, or

collection as to work an illegal trespass upon the property rights of the individual. They may go beyond the powers thereby conferred, and when they do so the fact that they are assuming to act under a valid law will not oust the courts of jurisdiction to restrain their excessive and illegal acts. In *Cunningham* v. *Macon & Brunswick Railroad*, 109 U. S. 446, 452, it was said :

" Another class of cases is where an individual is sued in tort for some act injurious to another in regard to person or property, to which his defence is that he has acted under the orders of the government.

` " In these cases he is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because · he *asserts* authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him. See *Mitchell* v. *Harmony*, 13 How. 115 ; *Bates* v. *Clark*, 95 U. S. 204 ; *Meigs* v. *McClung*, 9 Cranch, 11 ; *Wilcox* v. *Jackson*, 13 Pet. 498 ; *Brown* v. *Huger*, 21 How. 305 ; *Grisar* v. *McDowell*, 6 Wall, 363."

Nor can it be said in such a case that relief is obtainable only in the courts of the State. For it may be laid down as a general proposition that, whenever a citizen of a State can go into the courts of a State to defend his property against the illegal acts of its officers, a citizen of another State may invoke the jurisdiction of the Federal courts to maintain a like defence. A State cannot tie up a citizen of another State, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. Given a case where a suit can be maintained in the courts of the State to protect property rights, a citizen of another State may invoke the jurisdiction of the Federal courts. *Cowles* v. *Mercer County*, 7 Wall. 118 ; *Lincoln County* v. *Luning*, 133 U. S. 529 ; *Chicot County* v. *Sherwood*, 148 U. S. 529.

We need not, however, rest on the general powers of a Federal court in this respect, for in the act before us express authority is given for a suit against the commission to accom-

plish that which was the specific object of the present suit. Section 6 provides that any dissatisfied "railroad company, or other party at interest, may file a petition" "in a court of competent jurisdiction in Travis County, Texas, against said commission as defendant." The language of this provision is significant. It does not name the court in which the suit may be brought. It is not a court of Travis County, but in Travis County. The language differing from that which ordinarily would be used to describe a court of the State was selected apparently in order to avoid the objection of an attempt to prevent the jurisdiction of the Federal courts. The Circuit Court for the Western District of Texas is "a court of competent jurisdiction in Travis County." Not only is Travis County within the territorial limits of its jurisdiction, but also Austin, in that county, is one of the places at which the court is held. Act of June 3, 1884, c. 64, 23 Stat. 35. It comes, therefore, within the very terms of the act. It cannot be doubted that a State, like any other government, can waive exemption from suit. Were this in terms a suit against the State, if by express statute the State had waived its exemption and consented that suit might be brought against it by name in any court of competent jurisdiction in Travis County, it might well be argued that thereby it consented to a suit, brought by a citizen of another State, in the Circuit Court of the United States for the Western District of Texas, sitting in Travis County, on the ground that the limitations of the Eleventh Amendment to the Federal Constitution simply create a personal privilege which can at any time be waived by the State. However, it is unnecessary to go so far as that, for this cannot, for the reasons heretofore indicated, in any fair sense be considered a suit against the State.

Still another matter is worthy of note in this direction. In the famous *Dartmouth College case,* 4 Wheat. 518, it was held that the charter of a corporation is a contract protected by that clause of the National Constitution, which prohibits a State from passing any law impairing the obligation of contracts. The International and Great Northwestern Railroad Company is a corporation created by the State of Texas. The

charter which created it is a contract whose obligations neither party can repudiate without the consent of the other. All that is within the scope of this contract need not be determined. Obviously, one obligation assumed by the corporation was to construct and operate a railroad between the termini named ; and on the other hand, one obligation assumed by the State was that it would not prevent the company from so constructing and. operating the road. If the charter had in terms granted to the corporation power to charge and collect a definite sum per mile for the transportation of persons or of property, it would not be doubted that that express stipulation formed a part of the obligation of the State which it could not repudiate. Whether, in the absence of an express stipulation of that character, there is not implied in the grant of the right to construct and operate, the grant of a right to charge and collect such tolls as will enable the company to successfully operate the road and return some profit to those who have invested their money in the construction, is a question not as yet determined. It is at least a question which arises as to the extent to which that contract goes, and one in which the corporation has a right to invoke the judgment of the courts ; and if the corporation, a citizen of the State, has the right to maintain a suit for the determination of that question, clearly a citizen of another State, who has, under authority of the laws of the State of Texas, become pecuniarily interested in, equitably indeed the beneficial owner of, the property of the corporation, may invoke the judgment of the Federal courts as to whether the contract rights created by the charter, and of which it is thus the beneficial owner, are violated by subsequent acts of the State in limitation of the right to collect tolls. Our conclusion from these considerations is that the objection to the jurisdiction of the Circuit Court is not tenable, and this, whether we rest upon the provisions of the statute or upon the general jurisdiction of the court existing by virtue of the statutes of Congress, under the sanction of the Constitution of the United States.

Passing from the question of jurisdiction to the act itself, there can be no doubt of the general power of a State to regu-

late the fares and freights which may be charged and received by railroad or other carriers, and that this regulation can be carried on by means of a commission. Such a commission is merely an administrative board created by the State for carrying into effect the will of the State as expressed by its legislation. *Railroad Commission Cases*, 116 U. S. 307. No valid objection, therefore, can be made on account of the general features of this act; those by which the State has created the railroad commission and entrusted it with the duty of prescribing rates of fares and freights as well as other regulations for the management of the railroads of the State.

Specific objections are made to the act, on the ground that, by section 5, the rates and regulations made by the commission are declared conclusive in all actions between private individuals and the companies, and that by section 14 excessive penalties are imposed upon railroad corporations for any violation of the provisions of the act; and thus, as claimed, there is not only a limitation but a practical denial to railroad companies of the right of a judicial inquiry into the reasonableness of the rates prescribed by the commission. The argument is, in substance, that railroad companies are bound to submit to the rates prescribed until in a direct proceeding there has been a final adjudication that the rates are unreasonable, which final adjudication, in the nature of things, cannot be reached for a length of time; that meanwhile a failure to obey those regulations exposes the company, for each separate fare or freight exacted in excess of the prescribed rates, to a penalty so enormous as in a few days to roll up a sum far above the entire value of the property; that even if in a direct proceeding the rates should be adjudged unreasonable, there is nothing to prevent the commission from reëstablishing rates but slightly changed and still unreasonable, to set aside which requires a new suit, with its length of delay; and thus, as is claimed, the railroad companies are tied hand and foot and bound to submit to whatever illegal, unreasonable, and oppressive regulations may be prescribed by the commission.

It is enough to say in respect to these matters, at least so

far as this case is concerned, that it is not to be supposed that the legislature of any State, or a commission appointed under the authority of any State, will ever engage in a deliberate attempt to cripple or destroy institutions of such great value to the community as the railroads, but will always act with the sincere purpose of doing justice to the owners of railroad property, as well as to other individuals; and also that no legislation of a State, as to the mode of proceeding in its own courts, can abridge or modify the powers existing in the Federal courts, sitting as courts of equity. So that if in any case, there should be any mistaken action on the part of a State, or its commission, injurious to the rights of a railroad corporation, any citizen of another State, interested directly therein, can find in the Federal court all the relief which a court of equity is justified in giving. We do not deem it necessary to pass upon these specific objections because the fourteenth section or any other section prescribing penalties may be dropped from the statute without affecting the validity of the remaining portions; and if the rates established by the commission are not conclusive, they are at least *prima facie* evidence of what is reasonable and just. For the purpose of this case it may be conceded that both the clauses are unconstitutional, and still the great body of the act remains unchallenged — that which establishes the commission, and empowers it to make reasonable rates and regulations for the control of railroads. It is familiar law that one section or part of an act may be invalid without affecting the validity of the remaining portion of the statute. Any independent provision may be thus dropped out if that which is left is fully operative as a law, unless it is evident from a consideration of all the sections that the legislature would not have enacted that which is within, independently of that beyond its power.

Applying this rule, the invalidity of these two provisions may be conceded without impairing the force of the rest of the act. The creation of a commission, with power to establish rules for the operation of railroads and to regulate rates, was the prime object of the legislation. This is fully accomplished whether any penalties are imposed for a viola-

tion of the rules prescribed, or whether the rates shall be conclusive or simply *prima facie* evidence of what is just and reasonable. The matters of penalty and the effect as evidence of the rates are wholly independent of the rest of the statute. Neither can it be supposed that the legislature would not have established the commission and given it power over railroads without these independent matters. In other words, it is not to be presumed that the legislature was legislating for the mere sake of imposing penalties, but the penalties and the provision, as to evidence, were simply in aid of the main purpose of the statute. They may fail, and still the great body of the statute have operative force, and the force contemplated by the legislature in its enactment. Take a similar body of legislation — a tax law. There may be incorporated into such a law a provision giving conclusive effect to tax deeds, and also a provision as to the penalties incurred by non-payment of taxes. These two provisions may, for one reason or another, be obnoxious to constitutional objections. If so, they may be dropped out, and the balance of the statute exist. It would not for a moment be presumed that the whole tax system of the State depended for its validity upon the penalties for non-payment of taxes or the effect to be given to the tax deed. We, therefore, for the purposes of this case, assume that these two provisions of the statute are open to the constitutional objections made against them. We do not mean by this to imply that they are so in fact, but simply that it is unnecessary to consider and determine the matter, and we leave it open for future consideration.

It appears from the bill that, in pursuance of the powers given to it by this act, the state commission has made a body of rates for fares and freights. This body of rates, as a whole, is challenged by the plaintiff as unreasonable, unjust, and working a destruction of its rights of property. The defendant denies the power of the court to entertain an inquiry into that matter, insisting that the fixing of rates for carriage by a public carrier is a matter wholly within the power of the legislative department of the government and beyond examination by the courts.

It is doubtless true, as a general proposition, that the formation of a tariff of charges for the transportation by a common carrier of persons or property is a legislative or administrative rather than a judicial function.    Yet it has always been recognized that, if a carrier attempted to charge a shipper an unreasonable sum, the courts had jurisdiction to inquire into that matter and to award to the shipper any amount exacted from him in excess of a reasonable rate ; and also in a reverse case to render judgment in favor of the carrier for the amount found to be a reasonable charge.    The province of the courts is not changed, nor the limit of judicial inquiry altered, because the legislature instead of the carrier prescribes the rates. The courts are not authorized to revise or change the body of rates imposed by a legislature or a commission ; they do not determine whether one rate is preferable to another, or what under all circumstances would be fair and reasonable as between the carriers and the shippers ; they do not engage in any mere administrative work ; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and if found so to be, to restrain its operation.    In *Chicago, Burlington & Quincy Railroad* v. *Iowa,* 94 U. S. 155, and *Peik* v. *Chicago & Northwestern Railway,* 94 U. S. 164, the question of legislative control over railroads was presented, and it was held that the fixing of rates was not a matter within the absolute discretion of the carriers, but was subject to legislative control.    As stated by Mr. Justice Miller, in *Wabash &c. Railway* v. *Illinois,* 118 U. S. 557, 569, in respect to those cases :

" The great question to be decided, and which was decided, and which was argued in all those cases, was the right of the State, within which a railroad company did business, to regulate or limit the amount of any of these traffic charges."

There was in those cases no decision as to the extent of control, but only as to the right of control.    This question came again before this court in *Railroad Commission Cases,* 116 U. S. 307, 331, and while the right of control was re-

affirmed a limitation on that right was plainly intimated in the following words of the Chief Justice:

"From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

This language was quoted in the subsequent case of *Dow* v. *Beidelman*, 125 U. S. 680, 689. Again, in *Chicago & St. Paul Railway* v. *Minnesota*, 134 U. S. 418, 458, it was said by Mr. Justice Blatchford, speaking for the majority of the court:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring the process of law for its determination."

And in *Chicago & Grand Trunk Railway* v. *Wellman*, 143 U. S. 339, 344, is this declaration of the law :

"The legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates."

*Budd* v. *New York*, 143 U. S. 517, announces nothing to the contrary. The question there was not whether the rates were reasonable, but whether the business, that of elevating grain, was within legislative control as to the matter of rates. It was said in the opinion : " In the cases before us, the records do not show that the charges fixed by the statute are unreasonable." Hence there was no occasion for saying anything as to the power or duty of the courts in case the rates as established had been found to be unreasonable. It was enough that upon examination it appeared that there was no evidence upon which it could be adjudged that the rates were in fact open to objection on that ground.

These cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body, or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held. It was, therefore, within the competency of the Circuit Court of the United States for the Western District of Texas, at the instance of the plaintiff, a citizen of another State, to enter upon an inquiry as to the reasonableness and justice of the rates prescribed by the railroad commission. Indeed, it was in so doing only exercising a power expressly named in the act creating the commission.

A classification was made by the commission, and different rates established for different kinds of goods. These rates were prescribed by successive circulars. Classification of rates is based on several considerations, such as bulk, value, facility

of handling, etc.; it is recognized in the management of all railroads, and no complaint is here made of the fact of classification, or the way in which it was made by the commission. By these circulars, rates all along the line of classification were reduced from those theretofore charged on the road. The challenge in this case is of the tariff as a whole, and not of any particular rate upon any single class of goods. As we have seen, it is not the function of the courts to establish a schedule of rates. It is not, therefore, within our power to prepare a new schedule or rearrange this. Our inquiry is limited to the effect of the tariff as a whole, including therein the rates prescribed for all the several classes of goods, and the decree must either condemn or sustain this act of quasi legislation. If a law be adjudged invalid, the court may not in the decree attempt to enact a law upon the same subject which shall be obnoxious to no legal objections. It stops with simply passing its judgment on the validity of the act before it. The same rule obtains in a case like this.

We pass then to the remaining question, Were the rates, as prescribed by the commission, unjust and unreasonable? The bill, it will be remembered, was filed by a second mortgagee. The railroad company was made a defendant, and filed a cross-bill. Each of these bills contains a general averment that the rates are unjust and unreasonable. That in the original bill, which was filed April 30, 1892, or some six or seven months after the action of the commission, is in these words:

"Eighth. That the classifications and schedules of rates and charges so announced and promulgated in and by said commodity tariffs and circulars of said commission, or sought so to be, as hereinbefore shown, are unfair, unjust, and unreasonable, and that the same cannot be adopted or put or continued in effect by the defendant company or defendant receiver, without serious and irreparable loss to it, and serious and irreparable injury to and destruction of the property, rights, and interests of your orator and the beneficiaries of its trust as hereinafter more fully set forth; that the rates so charged and announced by said commission are not compensatory, and

are unreasonably low, and that the adoption and enforcement thereof would result, as nearly as can be estimated, in a diminution of revenues derived from the operation of said International and Great Northern Railroad, aggregating more than $200,000 per annum, and that the revenues from said railroad, so reduced and diminished, would be inadequate and insufficient to provide for the payment of the interest upon the prior obligations of the defendant railroad company, recited in paragraph 4 hereof, and the interest upon the second mortgage bonds secured by said mortgage to your orator as trustee, after providing for the expenses of operating said lines of railroad and property, and maintaining the same in proper order and good working condition, so that the traffic and business of said road, and of every part thereof shall at all times be conducted with safety to person and property, and with due expedition."

It may not be just to take this as an allegation of a mere matter of fact, the truthfulness of which is admitted by the demurrer, and which, as thus admitted, eliminates from consideration all questions as to the true character and effect of the rates, yet it is not to be ignored. There are often in pleadings general allegations of mixed law and fact, such as of the ownership of property and the like, which standing alone are held to be sufficient to sustain judgments and decrees, and yet are always regarded as qualified, limited, or even controlled by particular facts stated therein. It would not, of course, be tolerable for a court administering equity to seize upon a technicality for the purpose or with the result of entrapping either of the parties before it. Hence, we should hesitate to take the filing of the demurrers to these bills as a direct and explicit admission on the part of the defendants that the rates established by the commission are unjust and unreasonable. Yet it must be noticed that at first answers were filed, tendering issue upon the matters of fact, and testimony was taken, the extent of which, however, is not disclosed by the record. After that the defendants applied for leave to withdraw their answers and file demurrers. It is not to be supposed that this was done thoughtlessly. But one conclusion

can be drawn from that action, and that is that upon the taking of their testimony defendants became satisfied that the particular facts were as stated in the bills, and that the conclusions to be drawn from such facts could not be overthrown by any other matters. Hence, if it appears that the facts stated in detail tend to prove that the rates are unreasonable and unjust, we must assume, as against the demurrers, that the general allegation heretofore quoted is true, and that there are no other and different facts which, if proved, might induce a different conclusion, and compel a different result.

What, then, are the special facts disclosed in the several bills? It appears that there is a bonded indebtedness of over $15,000,000, and in addition capital stock to the amount of $9,755,000; that the bonds and stock were issued for and represent value, and that the rates theretofore existing on the road were not sufficient to enable the company to pay all the interest on the bonds. At the time suit was commenced the first mortgage bonds outstanding amounted to $7,054,000, drawing 6 per cent interest; the second mortgage bonds to $7,954,000, drawing also 6 per cent interest. The stockholders had never received any dividends whatever upon their investment, but on the contrary (as appears from the cross-bill filed subsequently to the commencement of the suit) they had been forced to pay a cash assessment of over a million of dollars, or about 12 per cent of the face value of the stock, for the purpose of providing in part for the interest upon the first mortgage bonds; the holders of those bonds had been compelled to accept, and had accepted, in payment of one-half of the accrued and defaulted interest — a sum exceeding $750,000 — deferred certificates of indebtedness bearing interest at the rate of 5 per cent; the holders of the second mortgage bonds had been called upon to fund, and substantially all had consented to fund, passed due interest, amounting to upwards of $1,250,000, in third mortgage bonds, bearing 4 per cent interest, and they had also been required to reduce, and substantially all had agreed to reduce, the interest on their bonds to $4\frac{1}{2}$ per cent per annum for the period of six

years, and thereafter to 5 per cent per annum. For about three years the road had been in the hands of a receiver, appointed on account of the default of the company in the payment of its obligations. A statement in detail was incorporated in the bill of the earnings and operating expenses of the road during the years 1889 and 1890, and the first nine months of 1891, which was supplemented by a like statement in the cross-bill subsequently filed of the earnings and expenses for the entire year 1891 and the first three months of 1892. These statements show the following figures:

```
"1889 : Earnings .......................... $3,488,185 14
         Operating expenses, exclusive of taxes   2,629,452 90
         Surplus ...........................     858,732 24
  1890 : Earnings ..........................   3,646,422 33
         Operating expenses, exclusive of taxes   3,148,245 09
         Surplus ...........................     498,177 24
  1891 : Earnings ..........................   3,648,641 79
         Operating expenses, exclusive of taxes   3,093,550 20
         Surplus ...........................     555,091 59
Three months of 1892 :
         Earnings ..........................     759,176 18
         Operating expenses, exclusive of taxes   829,074 87
         Deficit ...........................      69,898 69 "
```

The bill also contains a tabular statement of the revenue per ton per mile derived from the operation of the road during the years 1883 to 1893, inclusive, as follows:

```
" Revenue per ton per mile for 1883....... (in cents).. 2.03
      "        "        "       1884................. 1.90
      "        "        "       1885................. 1.71
      "        "        "       1886................. 1.65
      "        "        "       1887................. 1.38
      "        "        "       1888................. 1.33
      "        "        "       1889................. 1.44
      "        "        "       1890................. 1.38
      "        "        "       1891, (first nine months) 1.30 "
```

The mileage owned and operated by the company within the State of Texas amounts to 825 miles. There had been necessarily expended in cash in the construction and equipment of its road more than $50,000 per mile, and it could not be replaced for less than $30,000 per mile. There is also this allegation in the cross-bill:

"That the lines of railway of your orator's company have at all times been operated as economically as practicable, and that its operating expenses have at all times been as reasonable and low in amount as they could be made by economical and judicious management, and that it has not been possible for your orator to operate said road for less than it has been operated. That for the year ending June 30, 1892, there were employed by your orator's company seventeen general officers, who received during said year an average daily compensation of $12.64, and, exclusive of its general officers, all of its employés during and for the year ending June 30, 1892, received an average daily compensation of $2.01, and that at all times your orator has secured the service of its officers and employés as cheaply as practicable, and has employed no more than necessary, and that the above were fair and reasonable rates of pay. That at all times the International and Great Northern Railroad Company has secured all supplies, material, and property, of whatever character, for the operation of its road at the cheapest market price and at as low rates as the same could be secured, and has secured and used no more than actually necessary in the operation of the road."

In the amendment to the cross-bill, filed in March, 1893, is given a table showing the actual reductions in amounts received by the railroad company for the transportation of the different classes of goods under the operation of the new tariffs up to August 31, 1892, and amounting to $159,694.51, and also a table showing the per cent of reductions as to different articles — varying from 5 per cent on cement to 54.90 per cent on grain in carloads. The bill also, in general terms, negatives the probability of any increase in amount of business to compensate for the reduction in rates, a negation sustained by the figures given in the amended bill as to the

actual effect upon the receipts. It also contains a general averment that the rates on interstate business would be injuriously affected to an equal amount by reason of the reduction of rates on business within the State.

As against these facts the attorney general presses these matters: In the table in the bill heretofore referred to, showing earnings and expenses during the years 1889 and 1890, and the first nine months of 1891, there is this item several times repeated, " balance of income account," and this on September 30, 1891, is stated at $3,795,785.68. Of what this account is composed we are not informed, (possibly there was included within it the proceeds of the land grant, which, as we are told, was made by the State to the corporation,) but, whatever it includes, it was on January 1, 1889, as stated, $2,612,118.68, which would make the increase of that account during the two years and nine months to be $1,183,667. Confessedly no interest was paid during those years, and that amounted each year to something like $900,000, or nearly two millions and a half for the two years and nine months. It is obvious that, no matter what may have been in the bookkeeping of the company included in this account, or how much or from what sources in prior years the road had accumulated this balance, the increase during the time stated did not equal the accruing interest. The attorney general also notices the report for the year ending June 30, 1892, made by the company to the railroad commission, a copy of which is attached as an exhibit to the amendment to the cross-bill, and from that he tabulates a statement which, as he contends, shows that the earnings during that year were sufficient to pay the operating expenses and fixed charges. We give the table as he has prepared it:

" Gross earnings from operation .......... $3,568,690 26
Less operating expenses................ 2,986,204 12

       Income from operation ........    $582,486 14

To which should be added amounts expended for 'cost of road, equipment, and permanent improvements,' admitted to have been included in operating expenses ................................    302,085 77

Dividends on (compress) stocks owned....    8,020 00

       Total income .................    $892,591 91

          Deductions from Income.

Interest on funded debt accrued during the year, viz. :

On $7,954,000 first mortgage
   bonds at 6% .............. $477,240 00

On $7,054,000 second mortgage bonds, one month, at
   6% ..................... 35,270 00

On $7,054,000 second mortgage bonds, eleven months,
   at $4\frac{1}{2}$% ................. 290,977 50

      Total interest accrued ... $803,487 50

Rental paid Colorado River
   Bridge Company........... 14,583 32

Taxes...................... 28,951 35

      Total deductions ..............    $847,022 17

Surplus after paying operating expenses proper, interest accrued on bonds, taxes, etc. ................................    $45,569 74 "

But this table ignores that which is disclosed in the cross-bill, to wit, $750,000 in certificates of indebtedness, bearing interest at five per cent and $1,250,000, third mortgage bonds, bearing four per cent interest, the interest on which sums would exceed all the apparent surplus. These items

also appear in the report, under the head of current liabilities, the total balance of which on July 1, 1892, is given as $3,772,062.94, which sum may not unreasonably be taken as showing by how much the company has fallen short of paying its operating expenses and fixed charges.   Again, the sum of $302,085.77 appears in that table, under the description "Cost of road, equipment and permanent improvements, admitted to have been included in operating expenses," and is added to the income as though it had been improperly included in operating expenses.   But before this change can be held to be proper, it is well to see what further light is thrown on the matter by other portions of the report. That states that there were no extensions of the road during that year, so that all of this sum was expended upon the road as it was.   Among the items going to make up this sum of $302,085.77 is one of $113,212.09 for rails, and it appears from the same report that there was not a dollar expended for rails, except as included within this amount.   Now, it goes without saying that in the operation of every road there is a constant wearing out of the rails and a constant necessity for replacing old with new.   The purchase of these rails may be called permanent improvements, or by any other name, but they are what is necessary for keeping the road in serviceable condition.   Indeed, in another part of the report, under the head of "renewals of rails and ties," is stated the number of tons of "new rails laid" on the main line.   Other items therein are for fencing, grading, bridging, and culvert masonry, bridges and trestles, buildings, furniture, fixtures, etc.   It being shown affirmatively that there were no extensions, it is obvious that these expenditures were those necessary for a proper carrying on of the business required of the company.   Certainly the mere title, under which these expenditures are once stated, is not sufficient to overthrow the facts so fully and clearly shown that the stockholders have never received any dividends; that in order to meet the accumulating interest on the bonds they have had to put their hands in their pockets and advance a million and over of dollars.   Those are facts whose significance cannot be

destroyed by any mere manner of bookkeeping or classifica-
tion of expenditures.

Further, the attorney general asserts that there are five
trunk lines, of which the International and Great Northern
road is one, paralleling each other, and thus dividing the busi-
ness of the territory through which they pass; that the State
of Texas had made large donations of land to railroad com-
panies, and that, as appears from its executive documents, this
railroad company had received a donation of 3,352,320 acres
to aid in its construction, as well as exemption of all its
property from taxation for twenty-five years. He also calls
attention to the financial depression which has of late years
pervaded every avenue of trade, and adds a table from the
report of the Commissioner of Agriculture of Texas, show-
ing as to different articles produced in that State an increase
in the amount of product and a decrease in the prices received
therefor; all of which considerations, he earnestly insists,
affect the question of the reasonableness of the rates prescribed.

None of the matters mentioned in the foregoing paragraph
appear in the pleadings, or elsewhere in the record, and it is,
therefore, doubtful to what extent they may be taken into
consideration. If we may take judicial notice of the five
parallel roads, must we also assume that the existence of the
other four diminishes the business of the. International and
Great Northern, and that, if they had never been built, all
the business which now passes over the five would have been
carried by the one? May not the topography of the country
be such as to prevent any of the business of the other roads
from ever coming to the International and Great Northern,
even if, without them, it was obliged to seek water or wagon
transportation? May not the building of those other roads
have increased the population and business to such an extent
that the overflow has, so far from diminishing, really resulted
in an increase of the business of the International and Great
Northern? If there has been a division of business, has there
not also been a competition by which the rates have been
reduced, and reduced to such an extent as to forbid the pro-
priety of any further reduction? If we may take judicial

notice that the State made a grant of three million and odd
acres to the company, must we also take notice of the value
of that land, of its sale, and the amount realized therefrom?
While undoubtedly there has been lately a period of financial
depression, can we take judicial notice of the extent to which
that depression has reduced the prices of the products of the
State; and is the report of the Commissioner of Agriculture
of the State to be considered as evidence before us, and
accepted as substantially correct, both as to product and
prices? And if the depreciation of prices, as stated in said
report, be accepted as correct, will such depreciation uphold a
compulsory reduction of the rates of transportation to such an
extent that some of those who have invested their money in
railroad transportation receive no compensation therefrom?
Is it just to deprive one party of all compensation in order
that another may make some profit? They who invest their
money in railroads take the same chances that men engaged
in other business do of making profit from the carrying on of
their business; and, as appears from other cases submitted to
us with this, some of the railroads in the State of Texas have
been operated at a constant loss. But such possibilities of
loss are simply the natural results of all business freely carried
on, against which the law is powerless to afford protection.
Very different are the considerations which arise when the
strong arm of the law is invoked to compel parties engaged
in legitimate business, and business which cannot be aban-
doned at will, to so reduce their charges for service as to make
the carrying on of that business result in a continued loss.
In the one case the law is powerless to prevent injury; in the
other it is used to work injury. Counsel suggest that the
State itself may construct and operate railroads, and then
may properly make rates so low that the business is done at a
loss. They refer to the postal system of the United States
which, carried on for the common welfare, not infrequently
results in a loss which is made good out of the public treasury.
But the parallel is not good. In the case suggested the loss is
cast through taxation upon the general public, and all bear
their proportionate share of that loss which is incurred in

securing a common benefit, while the scope of this legislation is to secure such common benefit at the expense of a single class. The equal protection of the laws — the spirit of common justice — forbids that one class should by law be compelled to suffer loss that others may make gain. If the State were to seek to acquire the title to these roads, under its power of eminent domain, is there any doubt that constitutional provisions would require the payment to the corporation of just compensation, that compensation being the value of the property as it stood in the markets of the world, and not as prescribed by an act of the legislature? Is it any less a departure from the obligations of justice to seek to take not the title but the use for the public benefit at less than its market value?

The act of 1853, to which reference has already been made, contained a section looking to the acquisition by the State of the title to railroad property. Section 17 of the act of February 7, 1853, c. 46, General Laws of Texas, 1853, page 58, is as follows :

" If the legislature of this State shall at any time make provision by law for the repayment to any such company of the amount expended by them in the construction of said road, together with all moneys for permanent fixtures, cars, engines, machinery, chattels, and real property then in use for the said road, with all moneys expended for repairs or otherwise, and interest on such sums at the rate of twelve per centum per annum, after deducting the amount of tolls, freights, passage money, and all moneys received from the sale of lands donated by the State to said company, with twelve per centum per annum interest on all such sums, then the road, with all its fixtures and appurtenances aforesaid, and all the lands donated to the same by the State and remaining unsold, shall vest in and revert to the State : *Provided*, That the State shall not be required to pay or allow a greater rate of interest on any amount of the money so expended by any company which shall have been borrowed from this State than the State shall have received for the same from such company."

This section, as will be perceived, provides for the payment

of interest at the high rate of 12 per cent on the difference between what the company has paid out and what it has taken in, and to that extent evidences the thought of the State that justice required the return to the builders of railroads of something more than the actual cost as the condition of de-priving them of the title.   It is only significant, however, as an expression of the thought of the State at the time; for, were the provision ever so unjust, every corporation which, after the passage of the act, invested its money in building a road would do so with the knowledge that that was the condition upon which the investment was made, and could not, therefore, challenge its validity.

And now, what deductions are fairly to be drawn from all the facts before us?   Is there anything which detracts from the force of the general allegation that these rates are unjust and unreasonable?   This clearly appears.   The cost of this railroad property was $40,000,000; it cannot be replaced to-day for less than $25,000,000.   There are $15,000,000 of mortgage bonds outstanding against it, and nearly $10,000,000 of stock.   These bonds and stock represent money invested in the construction of this road.   The owners of the stock have never received a dollar's worth of dividends in return for their investment.   The road was thrown into the hands of a re-ceiver for default in payment of the interest on the bonds. The earnings for the last three years prior to the establish-ment of these rates was insufficient to pay the operating ex-penses and the interest on the bonds.   In order to make good the deficiency in interest the stockholders have put their hands in their pockets and advanced over a million of dollars.   The supplies for the road have been purchased at as cheap a rate as possible.   The officers and employés have been paid no more than is necessary to secure men of the skill and knowledge requisite to suitable operation of the road.   By the voluntary action of the company the rate in cents per ton per mile has decreased in ten years from 2.03 to 1.30.   The actual reduc-tion by virtue of this tariff in the receipts during the six or eight months that it has been enforced amounts to over $150,000.   Can it be that a tariff which under these circum-

stances has worked such results to the parties whose money built this road is other than unjust and unreasonable? Would any investment ever be made of private capital in railroad enterprises with such as the proffered results?

It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others. There may be circumstances which would justify such a tariff; there may have been extravagance and a needless expenditure of money; there may be waste in the management of the road; enormous salaries, unjust discrimination as between individual shippers, resulting in general loss. The construction may have been at a time when material and labor were at the highest price, so that the actual cost far exceeds the present value; the road may have been unwisely built, in localities where there is no sufficient business to sustain a road. Doubtless, too, there are many other matters affecting the rights of the community in which the road is built as well as the rights of those who have built the road.

But we do hold that a general averment in a bill that a tariff as established is unjust and unreasonable, is supported by the admitted facts that the road cost far more than the amount of the stock and bonds outstanding; that such stock and bonds represent money invested in its construction; that there has been no waste or mismanagement in the construction or operation; that supplies and labor have been purchased at the lowest possible price consistent with the successful operation of the road; that the rates voluntarily fixed by the company have been for ten years steadily decreasing until the aggregate decrease has been more than fifty per cent; that under the rates thus voluntarily established, the stock, which represents two-fifths of the value, has never received anything in the way of dividends, and that for the last three years the earnings above operating expenses have been insufficient to

pay the interest on the bonded debt, and that the proposed tariff, as enforced, will so diminish the earnings that they will not be able to pay one-half the interest on the bonded debt above the operating expenses; and that such an averment so supported will, in the absence of any satisfactory showing to the contrary, sustain a finding that the proposed tariff is unjust and unreasonable, and a decree reversing it being put in force.

*It follows from these considerations that the decree as entered must be reversed in so far as it restrains the railroad commission from discharging the duties imposed by this act, and from proceeding to establish reasonable rates and regulations; but must be affirmed so far only as it restrains the defendants from enforcing the rates already established. The costs in this court will be divided.*