## COMMONWEALTH OF MASSACHUSETTS et al. v. DAVIS.

### No. 9041.

Court of Civil Appeals of Texas. Austin.

Feb. 18, 1942.

Rehearing Denied March 18, 1942.

Motion to Modify Denied April 15, 1942.

544

546

See, also, Tex.Civ.App., 160 S.W.2d 563.

Robert T. Bushnell, Atty. Gen., of Massachusetts, and Trueheart, McMillan & Russell, of San Antonio, for appellant Commonwealth of Massachusetts.

Richard L. Hughston and Albert B. Hall, both of Dallas, for appellant Sureties Fidelity & Deposit Co. of Maryland et al.

Fred L. Blundell and Tom Gambrell, both of Lockhart, and Brooks, Napier, Brown & Matthews, of San Antonio, for appellee.

BLAIR, Justice.

On June 23, 1937, appellant, the Commonwealth of Massachusetts, sued appellee, Edgar B. Davis, upon a Massachusetts income tax judgment, and on the same day ran a garnishment on the United North and South Development Company. On October 24, 1939, in an ancillary garnishment suit or proceeding, the trial court quashed the garnishment upon the motion of garnishee and the intervening defendant, Edgar B. Davis, because of certain alleged defects in the affidavit and garnishment bond; the answer of the garnishee having shown that Davis owned 186,751 of the 200,000 shares of the stock of the corporation. Thereafter, on October 26, 1939, the suit upon the Massachusetts income tax judgment and the cross-action of appellee for damages for wrongful garnishment went to trial, resulting on October 30, 1939, in an instructed verdict and judgment in favor of appellant Commonwealth in the amount of its Massachusetts judgment debt, $724,904.16, and a jury verdict and judgment in favor of appellee on his cross-action for damages for wrongful garnishment in the total sum of $1,550,000, the court rendering judgment, by way of offset of these amounts, against appellant Commonwealth and in favor of appellee for $825,095.84, and against each of the six sureties on the garnishment bond for the amount each had limited its liability in the bond, itself. From this judgment appellant Commonwealth and the sureties on the garnishment bond have appealed; and the appellant Commonwealth in the ancillary garnishment suit or proceeding has alone appealed from the judgment quashing the garnishment, which judgment we have this day affirmed in that suit and appeal. Also, in this appeal in the main suit appellee, by cross-assignment of error, contends that the trial court erred in not holding the Massachusetts income tax judgment void because of certain constitutional grounds urged both in the trial court and here.

The first point in this appeal relates to the sovereign immunities of appellant Commonwealth, which it alone raises, contending that neither the pleadings nor the evidence show the Commonwealth's consent to be sued either upon appellee's cross-action for damages for wrongful garnishment, or upon its pledge or contract liability therefor as contained in the garnishment bond obligation.

The general rule that a state may not be sued without its consent is not applicable here. The state itself instituted this suit, and the rule applicable is that when "a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive. This includes the right to make any defense by answer or cross-complaint germane to the matter in controversy." Anderson, Clayton & Co. v. State, 122 Tex. 530, 62 S.W. 2d 107, 110; State v. Zanco's Heirs, 18 Tex.Civ.App. 127, 44 S.W. 527, writ denied. In support of its above quoted rule, the Supreme Court cited 25 R.C.L., § 46, p. 411, wherein the authorities supporting the rule are collated, and which hold that the rule applies when a sister state is the plaintiff in the suit. 59 C.J. 319, 320, § 476; State v. Arkansas Brick & Mfg. Co., 98 Ark. 125, 135 S.W. 843, 33 L.R.A.,N.S., 376. Some courts hold that the state, by submitting to the jurisdiction of its judicial tribunals, waives any right to plead its immunity, at least to the extent of its own claim; while others hold that the defendant may have an affirmative judgment for any amount in excess of the state's claim where the defendant's claim is incident to, connected with, arises out of, or is germane to the suit or controversy. See State v. Arkansas Brick & Mfg. Co., 98 Ark. 125, 135 S.W. 843, 33 L.R.A.,N.S., 376, 377; 25 R.C.L., § 47, p. 411, and cases there cited. Our Supreme Court adopted the latter rule in the Anderson, Clayton & Co. case.

As between private suitors, our courts have uniformly held that a claim

for damages, resulting from the wrongful procuring of a writ of garnishment or attachment, is a matter "arising out of, incident to, or connected with the plaintiff's cause of action," and may be recovered by way of cross-action, plea in reconvention, or counterclaim in the suit in which such a writ is obtained. Waldman-Ross Grain Co. v. Davison & Co., Tex.Civ.App., 251 S. W. 521; Heidemann v. Martinez, Tex.Civ. App., 173 S.W. 1166; 38 Tex.Jur., § 30, pp. 347–349, and cases there cited. The state is regarded as a private individual when it enters suit and entitled to use the writ of garnishment to enforce its asserted rights, and must, in like manner as an individual, answer for any damages resulting from the wrongful procuring of the garnishment, which may be recovered by cross-complaint or action in the suit out of which the writ issued. In its answer to the ancillary garnishment proceeding, appellant Commonwealth states, "that under Texas law, your plaintiff in seeking redress in Texas courts submitted itself to jurisdiction of this court and is amenable to redress herein to the same extent as would any private individual be * * *." We agree with this statement, and in consequence of such right of the state it necessarily follows that it must be amenable to redress the wrong done to the same extent and in the same manner as would a private suitor. See Commonwealth v. Owensboro & N. Railroad Co., 81 Ky. 572, 573, and Port Royal & A. R. Co. v. State of South Carolina, C.C., 60 F. 552.

The trial court also held that appellant Commonwealth had authorized the bringing of the cross-action by appellee under both its general laws and its special law or Resolve enacted with reference to the instant case. Sec. 1 of Chap. 258, General Laws of Massachusetts, 1932, provides that "all claims at law or in equity against the commonwealth" shall be filed in certain courts; and Sec. 2 provides for trial without a jury and for venue of certain cases involving more than $2,000, and for damages resulting from injuries while traveling on the state highway.

■ Appellant Commonwealth contended, and we held, in the ancillary garnishment suit or proceeding, that the Governor and attorney had the authority originally to institute this suit, to secure the garnishment, and as an incidence of such authority to execute the garnishment bond as a binding obligation of the Commonwealth. The liability of appellant Commonwealth therefore arose under the law by virtue of use of legal process in a wrongful manner, which wrongful acts were done by its official in making the affidavit and executing the bond necessary to procure the writ of garnishment in the instant case, and such liability arose ex lege as well as on contract. The courts of Massachusetts have construed its general statute as authorizing suit against the Commonwealth upon actions which arise ex lege. See Murdock Parlor Grate Co. v. Commonwealth, 152 Mass. 28, 24 N.E. 854, 855, 8 L.R.A. 399, wherein the court say: "There are many obligations of the state not coming within the definitions of a contract, all of which definitions require a consent or agreement of the parties. Where a statute imposes an obligation which is enforced as if it arose ex contractu, there is not a contract, but the obligation arises ex lege. In Milford v. Com. [144 Mass. 64, 10 N.E. 516], above cited, the claim was of this class. The amended statute was intended to cover claims of this class not arising under contract, those of a breach of contract such as the subject of the suit in Wesson v. Com. [144 Mass. 60, 10 N.E. 762], contracts other than those for the payment of money, and perhaps other claims not convenient now to enumerate. This gives to the statute a full and sufficient meaning without holding, as the plaintiff urges, that a remedy in the nature of an action of tort against the commonwealth is afforded thereby for neglect or misfeasance of its officers or servants while engaged in the performance of their duties."

Some ten months after the appellant Commonwealth filed this suit and caused the writ of garnishment to be issued and served, and after the motion to quash same had been filed, the Legislature of appellant Commonwealth passed a Resolve, the material portions of which read as follows:

"Resolve Relative to Certain Litigation
Now Pending in the Courts of
the State of Texas.
* * *

"Whereas, two suits have been brought in the district court of Bexar County, thirty-seventh judicial district of Texas, one against said Davis and another, a garnishment proceeding, against United North and South Development Company, in an attempt to collect the aforesaid judgment, in which said suits William H. Russell, Esquire, of San Antonio, Texas, appears as attorney for the commonwealth; and

"Whereas, under the law of Texas, in order to procure the issuance of a writ of garnishment, it was necessary that a bond be filed in double the amount of indebtedness claimed, pursuant to which requirement His Excellency, Governor Charles F. Hurley, by and with the consent of the council, on June eighteenth, nineteen hundred and thirty-seven executed such bond in the principal sum of one million, four hundred thousand dollars, in which the commonwealth is principal and the Fidelity and Deposit Company of Maryland, Aetna Casualty and Surety Company, Indemnity Insurance Company of North America, Fidelity and Casualty Company of New York, National Surety Corporation and United States Fidelity and Guaranty Company are sureties, the condition of which bond is substantially that the commonwealth will prosecute its suit to effect and pay to said Davis all damages and costs that may be adjudged against it for wrongfully suing out said garnishment; and

"Whereas, the defendants have questioned the sufficiency of the bond, and the authority of the governor of the commonwealth to execute the same and to create a binding obligation on the commonwealth; therefore be it

"Resolved, that in order to remove any such doubts, the action of said governor and the council in executing said bond and the institution of said suits by William H. Russell, Esquire, as attorney, are ratified and confirmed.

"Approved May 6, 1938."

Appellee's claim is for damages resulting from the wrongful procuring of a writ of garnishment by appellant Commonwealth, and upon its bond obligation to pay damages therefor. The Resolve specifically ratified and confirmed "the action of said governor and council in executing said bond," so as "to create a binding obligation on the commonwealth" in the amount of $1,400,000, condition "that the commonwealth will prosecute its suit to effect and pay all damages and costs that may be adjudged against it for wrongfully suing out said garnishment." Clearly, the legislature, with full knowledge of the claim of wrongful garnishment, ratified and confirmed the contract entered into by the governor, and the procuring of the wrongful garnishment. The language of the Resolve shows the Legislature's own construction or interpretation of the existing laws of Massachusetts as authorizing the bringing of this suit, the acts of its officers and former attorney named in securing the writ of garnishment, and the executing of the garnishment bond in compliance with Texas laws, and the Resolve was passed to remove any doubt thereof and to ratify and confirm everything that had been done in the premises.

Appellant Commonwealth further contends, however, that if it should be held liable on the claim for damages asserted by the cross-complaint or action herein, then the jurisdiction of such suit is fixed by Sec. 2 of Chap. 258, General Laws 1932, in Suffolk County, Massachusetts. We regard this statute as being in part a general venue statute, which appellant Commonwealth waived by filing its suit in another jurisdiction, wherein the defendant had the right by cross-action, counterclaim, etc., to recover the damages resulting from the use of legal process in a wrongful manner in the suit. In the Anderson, Clayton & Co. case, the Supreme Court held that a venue statute may be waived by the voluntary appearance of the state in answering a cross-complaint or action.

Furthermore, and as conclusive of this question, the State of Massachusetts cannot by statute require a citizen of this state having a claim against it to file suit thereon in its own courts, because the Federal Constitution and laws authorize a non-resident to seek such relief in the Federal Courts. See Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014; McNeill v. Southern R. Co., 202 U.S. 543, 26 S.Ct. 722, 50 L.Ed. 1142; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764, wherein it is held that a state cannot tie up a citizen of another state, whose property rights have been invaded by unauthorized acts of the offending state's own officers, to suits for redress in its own courts.

The appellant Commonwealth makes the further point that since its suit is upon a judgment for taxes it is in effect a suit for taxes, and that under the uniform decisions no off-set or counterclaim can be made against the state in such a suit. The note on "Right of off-set, counterclaim or recoupment," in 33 L.R.A., N.S., 376; and 38 Tex.Jur., 306, the Texas cases there collated, and cases from other jurisdictions are cited in support of the contention. Generally speaking, these au-

thorities hold that as against the suit of the state for taxes, an off-set or counter-claim based on an illegal contract, or upon matters which grow out of entirely separate transactions or contracts, cannot be had against the state. None of these authorities involves the facts of the instant case. Here the state itself filed the suit and sought to use the extraordinary judicial process of garnishment; executed the bond obligation required to secure the process, agreeing to pay all damages resulting from the wrongful use of such process; and which acts of its officials in filing the suit and in executing the bond obligation to secure the process on behalf of the state were expressly ratified and confirmed by the legislature of the state instituting the suit.

Nor is the suit on the judgment for taxes a suit for taxes or in the nature of a suit for taxes. Appellant Commonwealth insisted and the trial court so held on the issue of the validity of the tax judgment sued on, and denied to appellee the right to go behind the judgment. This question is settled by the case of Milwaukee County v. M. E. White Co., 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220.

Appellant Commonwealth makes the further point that since its cause of action is one founded on a liquidated demand and the cross-action of appellee is founded on an unliquidated demand for wrongful garnishment sounding in tort, the cross-action is not maintainable. We have hereinabove fully stated the bases of the liability of the Commonwealth for the damages resulting from the wrongful garnishment, and that its liability is the same as that of an individual or private suitor under like facts and circumstances. Our courts have uniformly held that such damages are incident to, connected with, arise out of, and are germane to the action of plaintiff, and may be recovered by cross-action, plea in recon-vention, or off-set, or counterclaim in the suit out of which the writ issued, and our statute, Art. 2017, so provides. Tynberg v. Cohen, 76 Tex. 409, 13 S.W. 315; Michigan Stove Co. v. Waco Hardware Co., 22 Tex. Civ.App. 293, 54 S.W. 357; Heidemann v. Martinez, Tex.Civ.App., 173 S.W. 1166; 38 Tex Jur., §§ 24 and 27, pp. 328-338, and cases there cited.

Appellant Commonwealth also contends that the hereinabove quoted "Resolve" passed by the Massachusetts Legislature did not create a binding obligation on the Com-

monwealth, because this could be done only by a general law or act. The Constitution of Massachusetts, pt. 2, c. 1, § 1, art. 2, provides: "No bill or resolve of the senate or house of representatives shall become law, and have force as such, until it shall have been laid before the governor for his revisal; and if he, upon such revision, approve thereof, he shall signify his approbation by signing the same."

Under this provision a "bill or resolve * * * become a law" when enacted by the Legislature and approved by the Governor.

In the case of Davis v. Commonwealth of Massachusetts, 164 Mass. 241, 41 N.E. 292, 293, 30 L.R.A. 743, there was involved a contract of the Commonwealth made in pursuance of a "Resolve" passed by the Legislature, which was held to be a valid contract, the court stating that: "The order of the governor and council passed February 5, 1890, seems to us within the authority granted by the resolve of March 20, 1888, and we have no doubt that the legislature had the constitutional power to pass the resolve. We cannot declare the contract made with the petitioner by the governor and council void as against public policy, because the legislature has sanctioned it."

In the instant case the Commonwealth itself filed the suit by its Governor, who on behalf of the Commonwealth executed the bond obligation required to secure a writ of garnishment which the Commonwealth had the right to use the same as any individual suitor, agreeing to pay all damages resulting from the use of the garnishment. The "Resolve" specifically ratified and confirmed "the action of said Governor and Council in executing said bond," so as "to create a binding obligation on the Commonwealth," in the amount of $1,400,-000, conditioned "that the Commonwealth will prosecute its suit to effect and pay all damages and costs that may be adjudged against it for wrongfully suing out said garnishment." The "Resolve", under the decision cited, was within the constitutional power of the Legislature and was intended to ratify and confirm all acts done in the premises. The garnishment bond is still in full force and effect at this time, and has been so since the service of the writ of garnishment.

As a defense to the suit on the Massachusetts tax judgment appellee alleged that it was void, because based on an unconstitutional statute, and by his cross-action

pleadings alleged that the garnishment was wrongful for the same reason. The trial court held that full faith and credit must be given to this judgment of a sister state, and instructed a verdict for appellant in the full amount thereof. Appellee cross-assigns error as to this action of the trial court.

We are of the view that full faith and credit must be given to the Massachusetts tax judgment, which itself concludes any questions that may be raised here as to the constitutionality of the statute imposing the tax, and in consequence the provisions of the statute need not be discussed. Suffice it to say that the statute particularly attacked, Sec. 25, Chap. 62, General Law of Massachusetts, 1921, superseded a prior statute of like language, and was itself amended and superseded in 1929 by a statute which eliminated the matters here asserted as rendering the amended statute unconstitutional. See Sec. 25, Chap. 62, General Laws of Massachusetts, 1932. Appellee contends that the statute is void, because too indefinite as to persons and subjects sought to be taxed and purports to impose the tax on persons and income or property irrespective of the residence of the persons, or whether the income is received in Massachusetts, all in violation of the provisions of the Federal Constitution relating to the distribution of powers between the states and relating to due process and equal protection of laws.

These same "highly difficult constitutional questions" regarding both this statute and its predecessor have been urged before the court of last resort of Massachusetts, but in each instance the court held the person sought to be taxed not subject to the statute, and in consequence held that "these constitutional objections * * * need not be discussed nor decided * * *." Kennedy v. Commissioner, 256 Mass. 426, 152 N.E. 747, 749; Hart v. Tax Commissioner, 240 Mass. 37, 132 N.E. 621. Also in the case of Commonwealth of Massachusetts v. Davis, 284 Mass. 41, 187 N.E. 33, wherein the judgment herein sued on was obtained against appellee, the Massachusetts court again declined to pass on the constitutionality of this statute, because the questions were not properly raised, or because they became immaterial under the construction given the statute. The court applied the rule prevailing in many jurisdictions, including Massachusetts, that the constitutionality of a statute may not be raised for the first time in an appellate court, and that the right to raise a constitutional question may be waived by a failure to set up and have the question passed on in the trial court, or by a failure to take an appeal properly. Such is not the rule in Texas (Gohlman Lester & Co. v. Whittle, 114 Tex. 548, 273 S.W. 808), but it is the rule in Massachusetts, and it is this Massachusetts judgment to which we must give full faith and credit under the Federal Constitution and statutes. This question is ruled by the recent case of Milwaukee County v. M. E. White Co., 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220, wherein full consideration is given the question; and wherein it is held that both state and federal courts must give full faith and credit to the judgment of another state for taxes.

If the Massachusetts income tax judgment which appellant sought to collect by the garnishment were void, then the garnishment is wrongful. Having held the judgment to be valid, or to be entitled to full faith and credit, that ground of alleged wrongful garnishment cannot be sustained.

Other grounds of wrongful garnishment alleged were:

1. Because the writ of garnishment was procured, issued and caused to be served by the filing of and on a void and unauthorized garnishment bond.

2. Because the sole statutory ground stated in the affidavit for the issuance of the garnishment was "that said defendant Edgar B. Davis had not, within affiant's knowledge, property in his possession within this state subject to execution sufficient to satisfy the judgment debt," which was untrue, because the former attorney who made the affidavit and the officials of appellant knew that appellee owned stock of the United North & South Development Company, situated in Texas, and of a value far in excess of the alleged judgment debt; and that the garnishment was recklessly procured and in conscious disregard of the rights of appellee, and without probable cause.

Appellee also alleged that the garnishment was wrongful, because it constituted a double levy and an abuse and misuse of the legal process of garnishment under the facts stated. No issue, however, was submitted to the jury as to this ground of

alleged wrongful garnishment, and it is not involved here.

Among other grounds on which the trial court quashed the garnishment in the ancillary garnishment suit was because the garnishment bond was executed by six corporate sureties, neither of which, jointly and severally with other sureties or the principal, bound itself for an amount equal to double the amount of the debt claimed, in violation of the express provisions of Art. 4077, relating to garnishment bonds. We have this day affirmed this action of the trial court on the appeal in the ancillary garnishment suit; and the trial court properly held in the instant suit that its action in the garnishment proceeding was conclusive as to this ground for quashing the garnishment.

As regards the authority of the Governor of appellant Commonwealth and its other officials to execute and file the bond and to secure the issuance of the writ of garnishment, we refer to our above holdings thereon, and to our above conclusions with respect to the liability of the appellant Commonwealth for damages resulting from wrongful garnishment.

The sole statutory ground stated in the affidavit for the issuance of the garnishment was that appellee did not have within the knowledge of affiant sufficient property in his possession in this state subject to execution to satisfy the judgment debt of appellant. If this statement were untrue, the garnishment is wrongful. Appellee alleged that it was untrue, and in answer to Special Issues 1 and 2 the jury found, in substance, as follows:

1. That at the time the writ of garnishment was issued and served appellee owned unencumbered stock of the United Company of sufficient value when sold under execution to satisfy the judgment debt of appellant.

2. That at the time of making the affidavit the attorney and officials of appellant knew that appellee owned stock of the United Company situated in Texas of sufficient value when sold under execution to satisfy the judgment debt of appellant.

The jury also found in answer to Special Issues 3 and 4 that the attorney and officials of appellant procured the issuance and service of the writ of garnishment "recklessly and in conscious disregard of the rights" of appellee "and in a spirit of in-difference as to whether he was injured or not," and "without probable cause."

Appellant Commonwealth and appellant sureties contend that no evidence supports these findings of the jury and particularly the finding that the attorney who made the affidavit for the garnishment and the officials who instituted this suit knew that appellee owned stock of the United North and South Development Company, garnishee, of sufficient value when sold under execution to satisfy the judgment debt in suit. Neither contention is sustained.

The said United Company is a Delaware corporation with a permit to do business in Texas where all of its properties and its principal office and place of business are located. Appellee owned 186,751 of the 200,000 shares of its stock, which has a par value of $10 per share. At the time of the garnishment appellee had pledged 76,094 shares of his stock to secure creditors and other creditors held options to purchase some of it, but there was enough unencumbered stock if sold at par value to pay the judgment debt, and there was testimony that some stock sold for a premium of $20 per share just prior to the garnishment, although the stock was not listed on any exchange for sale. Appellant Commonwealth and appellee stipulated that this stock had its situs in Texas at the time of the garnishment, and the attorney who made the affidavit for the garnishment knew that it was subject to execution under the Texas Statutes. Arts. 3795, 3798, R.S.1925.

The United Company is an oil development company and the value of its stock depended generally on the value of its oil properties. At the time of the garnishment it owned about 300 acres of oil leases in Caldwell and Guadalupe Counties, Texas, with some 50 producing wells in the highest structure of the field, and which leases had at the time of the trial an estimated 3,000,000 barrels of recoverable oil. It owned oil leases on about 10,000 acres of land in Matagorda County, Texas, known as the "Buckeye" field or properties, with two wells which had produced more than 700,000 barrels of oil. Shortly prior to this suit and garnishment a deep test well was completed a producer in this field, which extended it about 3½ miles and greatly enhanced the value of the "Buckeye" properties. The witnesses estimated these properties to have a value of from $5,000,000 to $10,000,000. A noted geolo-

gist, Irving Perrine, made a report on these properties to the public utility or corporation commission of appellant Commonwealth in 1933, in pursuance of its laws, which report reads:

"In making an estimate of the valuation of their properties, for the purpose of this report, I am omitting altogether every asset claimed by the Company of cash, accounts receivable, plant and equipment in other fields than Buckeye, all their land, leases and property rights in any other field, and I am basing my own opinion as to the value of their properties from the standpoint as to whether the price they have set upon their stock for sale in Massachusetts is fair and reasonable upon solely the estimated appraisal of the future reserves in oil and gas on the Buckeye Dome alone.

"You have kindly forwarded to me a report dated December 21, 1932, signed by a gentleman whose signature I cannot decipher and by Mr. E. W. Brucks, Geologist for the Company, stating their figures of the recoverable oil reserves contained in the Buckeye area which is located in Matagorda County, Texas. Mr. Brucks in this report is basing his recoverable reserves on an estimate of 40,000 barrels per acre under 2,080 acres of productive leases. Using these figures he gets a total recoverable reserve of 83,200,000 barrels. I have inspected in the Company's office, maps of the Dome first by magnetometer, second by torsion-balance and third by seismograph. All of these geophysical methods indicate clearly the presence of an immense Dome, and practically all of the 10,000 acres under lease are located on the Dome proper. The Dome is so huge that I believe production will extend to the East of their block of leases, and would recommend that they secure additional leases in that region if I were reporting for the Company.

"Palentological evidence shows the existence of several oil horizons below the present producing zone, and unquestionably in my opinion, shallower zones with both oil and gas will be discovered by future drilling. Briefly, I consider Mr. Brucks' estimate of 83,000,000 barrels ultra-conservative. In a Dome of this size deeply buried as it is, the possibilities of future production are so tremendous as to stagger the imagination."

The law under which this report was made, Chap. 110A, General Laws of Massachusetts, 1932, provides that "all information received by the commission under this chapter * * * and all financial statements so received concerning any securities shall be kept open by the commission to public inspection at reasonable hours, and the commission shall supply to the public copies of summaries of such information." Section 10(a). This public record bears directly upon the value of the stock of the United Company, and was admissible in evidence. This report was material, because the jury could have reasonably inferred that the officials of appellant Commonwealth had notice of it, and particularly so since the deep test well was completed a producer on these premises about 10 days prior to the filing of this suit and suing out of the writ of garnishment, which discovery of oil greatly enhanced the value of these properties, and which fact of discovery of oil was publicized in the newspapers of Texas and Massachusetts at that time.

The judgment roll introduced to prove the tax judgment sued on contained a stipulation that appellee owned upwards of 183,000 of the 200,000 shares of the stock of the United Company, which at that time had a fair value of $10 per share. Shortly prior to the service of the garnishment writ the United Company had financial difficulty in drilling deep test wells on its Buckeye properties, and a bankruptcy proceeding was instituted against it. Pending this proceeding there was completed a deep test well as a producer, which extended the Buckeye field about 3½ miles, greatly enhanced the value of these properties, and resulted in the dismissal of the bankruptcy proceeding and the reorganization of the United Company.

The attorney who made the affidavit for the garnishment testified that at that time he had information that appellee owned about 80% of the stock of the United Company, and that he "had pledged most of his stock" to secure notes of approximately $1,000,000; that an auditor's report showed the net value of the assets of the reorganized United Company to be $12,000, but that he made no inquiry as to whether its leases were carried on the books at cost value. The testimony showed that the leases were carried on the books at their cost prior to the discovery of oil on them. The jury could have reasonably inferred from the fact that appellant filed a surety bond in the amount of $1,400,000, for the

554

purpose of procuring the writ of garnishment to subject this specific stock of appellee to the payment of the judgment debt in suit, that the attorney and officials of appellant knew the assets of the United Company were worth much more than $12,000, and that in consequence the stock of appellee was very valuable. About 25 days before making the affidavit for the garnishment the affiant made inquiry of appellee and his employe and was frankly told by them the approximate amount of stock of the United Company owned by appellee, and the amount of debts which some of the stock was pledged to secure. Affiant made no inquiry as to the amount or value of the unencumbered stock of appellee, which he knew was subject to execution sale. No reason was given why he did not ascertain these facts, and he testified that he made no effort to do so.

■ The amount and kind of property actually owned by appellee at the time the writ of garnishment was sued out was very material on the question of whether appellant Commonwealth or its officials, or its attorney who made the affidavit for the garnishment knew that appellee owned property in this State subject to execution sufficient to satisfy the judgment debt in suit. Sayeg v. Federal Mortgage Co., Tex. Civ.App., 54 S.W.2d 238.

■ The facts and circumstances detailed fully support the jury's findings that the attorney and officials of appellant Commonwealth knew at the time of making the affidavit and suing out the garnishment writ that appellee owned property in Texas subject to execution and of sufficient value when sold under execution to satisfy the judgment debt in suit. The jury were not required to believe the statement and testimony of affiant that he did not know of property owned by appellee in Texas subject to execution and of sufficient value when sold under execution to satisfy the judgment debt in suit. The jury found upon sufficient evidence that the statement was untrue, and in consequence the garnishment was wrongfully sued out. Barr v. Cardiff, 32 Tex.Civ.App. 495, 75 S.W. 341, 342, error refused. Nor did the fact that affiant may have believed no such property existed control the question. This same question was determined in the Barr case, supra, wherein the court held: "The evidence shows that the ground alleged by plaintiff for suing out the writ of garnishment did not in fact exist, and that by

reason of the wrongful suing out and service of the writ the defendant was actually damaged in the amount found by the trial court. As the ground for the writ did not exist, it is a matter of no moment that plaintiff's son, an agent who made the affidavit therefor, believed its existence."

■ The facts and circumstances detailed also support the jury's findings that the attorney and officials of appellant Commonwealth sued out the garnishment writ "recklessly and in conscious disregard of the rights" of appellee and "in a spirit of indifference as to whether he was injured or not," and "without probable cause." The purpose of making the affidavit was to secure the garnishment writ to subject the stock of appellee in the United Company to the payment of the judgment debt in suit. Affiant knew that this stock was subject to execution. The law required that he make at least reasonable inquiry to ascertain the amount and value of this property, because such knowledge was very material on the question of whether affiant, as attorney and agent of appellant Commonwealth, knew that appellee owned property in this State subject to execution sufficient to satisfy the judgment debt sued on. Sayeg v. Federal Mortgage Company, supra. He made no inquiry either as to the amount of the unencumbered stock or its value. The jury found that it was of sufficient value when sold under execution to satisfy the judgment sued on at the time of garnishment.

There was also before the jury facts showing that at the time of the garnishment a suit pending in a Massachusetts court in the nature of garnishment, wherein assets costing more than $1,000,000 were impounded by injunction upon the sworn allegation of the assistant attorney general of Massachusetts that they belonged to appellee, and that he had attempted to convey them to corporations whose stock was owned solely by himself for the purpose of defrauding and defeating appellant Commonwealth in the collection of the same judgment debt herein sued on; and that although the Massachusetts proceeding was filed two years prior to this suit and four years prior to the trial of this suit, no effort had been made to prosecute the Massachusetts proceeding to final judgment or to subject the impounded property to the payment of the same judgment debt herein sued on.

■ In this connection appellants cite the case of Keating v. J. Stone & Sons Live

Stock Co., 83 Tex. 467, 18 S.W. 797, 29 Am.St.Rep. 670, as being conclusive of the proposition that since the statutes, Arts. 4078–4080, also permit garnishment to ascertain the ownership of shares of stock in a corporation, a writ of garnishment may be issued without first issuing a writ of execution. The proposition would be correct if diligent inquiry were first made without success as to the number and value of the shares of stock that were owned by the defendant in judgment. The cited case so holds because it is clear that the court based its holding on its finding that "Stone (the defendant in the judgment) was absent from the state, and the plaintiff in judgment made diligent inquiry of the officers and stockholders of the corporation to ascertain what interest in it was owned by Stone, but failed to get any information on the subject." No such state of facts appears in the instant case. The facts show that the defendant in judgment (Davis) was in the state, and the attorney and representative of appellant Commonwealth who made the affidavit for the garnishment testified that both Davis and an official of the corporation told him that Davis owned more than 80% of the stock, and that some of it was pledged to secure about $1,000,000 of indebtedness; and that he made no inquiry as to the number of shares of unpledged or unencumbered shares of stock that were owned by Davis, nor as to the value thereof. To hold under these facts that the garnishment was lawful would render nugatory the provisions of the garnishment statute requiring that the party who makes the affidavit for garnishment shall swear that he did not know of any property in Texas belonging to the defendant in judgment of sufficient value when sold under execution to satisfy the judgment debt.

The cause of action for wrongful garnishment as submitted to the jury is based upon the bond obligation to pay damages therefor and upon tort for malicious conduct in connection therewith, and relates to ground "2", wherein it was alleged and the jury found that the affidavit for garnishment, stating that appellee did not have within the knowledge of affiant sufficient property in this state when sold under execution to satisfy the judgment debt, was untrue. The jury further found that the attorney and officials of appellant Commonwealth procured the issuance and service of the garnishment in reckless and conscious disregard of the rights of appellee, and in a spirit of indifference as to whether he was injured, and without probable cause. The two items of damages sued for and found by the jury under this ground of wrongful garnishment were:

1. The value of an oil and gas lease on 1,200 acres of land in Matagorda County, the title to which the jury found was taken in the name of Ohio Goodyear Securities Company solely for the convenience of appellee Davis, the beneficial owner; that the value of the lease was $1,000,000; and that its loss was proximately caused by the issuance and service of the writ of garnishment.

2. The depreciation in the actual value of the stock of appellee due to cessation of the development on the properties of the United Company, which depreciation in value the jury found to be $550,000; and that the cessation in development and consequent depreciation in value of the stock was proximately caused by suing out and continuing in effect the writ of garnishment.

Several questions as to non-liability of both appellant Commonwealth and appellant sureties on the garnishment bond are raised by them as to these two items of damages. Those relating to the $1,000,000 damages found by the jury to have resulted from the loss of the 1,200-acre oil lease will be first considered. The pleadings and testimony as to this item of damages are, in substance, as follows:

At the time of the service of the garnishment writ impounding his stock in the United Company and for several years prior thereto, both as an individual and through the corporation, appellee Davis was engaged in the business of drilling for and producing oil in the State of Texas. Prior to the organization of the said United Development Company, Davis had been similarly engaged principally through United North & South Oil Company, a New York corporation, in which he owned 183,-000 of the 200,000 shares of stock. In 1926, a sale of most of the properties of the New York corporation was made for $12,100,000, and from these sales Davis received a large distribution in cash, and in addition received a 100% dividend on his stock (183,-000 shares) of the United North & South Development Company here involved, which is a Delaware corporation, and which took over the unsold assets of the New York corporation, consisting mostly of undeveloped oil leases in Texas. The

Massachusetts income tax judgment in suit is based on the income received by Davis from these transactions. The writ of garnishment was issued and served for the specific purpose of impounding and subjecting the stock of Davis in the Delaware corporation to the payment of said judgment.

In 1932 oil was discovered on the United Company's 10,000-acre lease in Matagorda County, at a depth of 7,800 feet, which was the deepest producing well in that area; opening up what is known as the Buckeye field. Later two more wells were brought in on this lease, the last one, brought in on June 15, 1937, called Stoddard A-1, was drilled to a depth of slightly more than 10,-000 feet. This well had been drilled to a depth of 9,833 feet by the United Company without discovery of oil, at which time appellee Davis took over the completion of the well, and testified that "it was carried down by funds that I furnished * * * on the basis that if it was good, it went to the corporation at what it cost me; if not, and if it was a failure, it was mine." This well extended the field 3½ miles, greatly enhanced the value of the company's 10,-000-acre lease, and was within the offset distance prescribed from the 1,200-acre lease, which Davis had purchased for $50,-000 in February, 1937. This lease was taken in the name of the Ohio Goodyear Securities Company, an Ohio corporation in which appellee Davis owned all the stock and was paid for with money coming to him from that corporation. The Ohio Company had no permit to do business in Texas; and appellee testified that the lease was taken in the name of the Ohio Company solely for his convenience, and that it was subject to his disposition and control, and at the time of the garnishment he had not decided what he would do with it, but that it could not be developed by the Ohio Company.

The jury found that the 1,200-acre oil lease was taken in the name of the Ohio Company solely for the convenience of appellee Davis, and that he was the beneficial owner of the same on June 23, 1937, up to and including August 15, 1937, at which time appellee testified that the lease was forfeited because of failure to drill under a 60-day drilling clause after the discovery of oil within the offset distance. The representative of Davis, Miller Ainsworth, testified that he had no connection with the Ohio Goodyear corporation, but that prior to the bringing in of the Stoddard A-1 well which was drilled by the Rutherford Drilling Company, he had entered into an arrangement with said drilling company to drill the offset well on the same basis of the Stoddard A-1 well, beginning within 60 days after the completion of the Stoddard A-1 well. P. R. Rutherford, who represented a drilling company, testified that he was an experienced oil well driller, had drilled the Lambert No. 1 and Stoddard A-1 on the United Company's 10,000-acre lease, and that the Stoddard A-1 was finished about the middle of June, 1937. That under his agreement with Ainsworth he was supposed to drill an offset well west of the Stoddard A-1, on a 1,200-acre adjoining tract; that after completing the Stoddard A-1 well he moved a derrick and some equipment on this tract for the purpose of beginning the well, but did not do so because Mr. Davis had been sued by the State of Massachusetts, and his stock had been garnished. That he discussed the matter with his attorney in Houston, and that his attorney asked him if he was relying upon the management of the United Company, or its assets, and he told him that he was relying upon both, but largely upon the management of the company by Mr. Davis; and the attorney advised him that since such were the facts he better not go too far with the United Company, because he was liable not to get his money. That the fact that the stock was garnished was the sole reason for his not going ahead with the drilling program as he had agreed to do. The 1,200-acre lease contract provided that if a well were discovered within the offset distance prescribed, lessee Goodyear Company agreed to commence a well within 60 days; recited that such a well was being drilled approximately 400 feet from the east line of the lease, and that unless such offset well were commenced within 60 days after the completion of a well on the adjoining land the lease would terminate, and be null and void and inoperative. The well referred to in the lease contract was shown to be the Stoddard A-1, which was completed June 15, 1937. It was shown to be a producer of high grade oil. Several witnesses testified that at the time of the service of the writ of garnishment the 1,200-acre lease had a reasonable value of from one to five million dollars.

After alleging fully his business as an oil producer, Davis also alleged that the issuance and service of the garnishment resulted in the stoppage, disturbance and in-

terference with his oil business, and in the development of his properties and " * * * prevented the financing of oil development and the securing of the drilling of wells by drilling contractors and the saving of valuable oil interests in substantial acreage in and adjacent to said oil field in Matagorda County, Texas, including oil and gas leasehold interests in said oil field in said county covering acreage of more than one thousand acres, of a value of more than $1,000,-000 has been legally lost to defendant through said writ preventing defendant from procuring and from continuing arrangements for the drilling of an oil well or oil wells thereon; defendant would therefore show that without legal basis or probable cause, the said State of Massachusetts, with the aid of said Surety Companies, has wrongfully oppressed and greatly injured defendant Edgar B. Davis in his business and property, to defendant's damage in the sum of $1,000,000."

The jury found, in answer to a special issue, that the lapsing or loss of the lease on the 1,200-acre tract was proximately caused by the issuance and service of the writ of garnishment.

The first group of propositions urged by appellants as to their non-liability for the $1,000,000 damages resulting from the lapsing or loss of the oil lease are, in substance, that such damages arise out of an alleged loss of credit, which relates to exemplary damages and are not recoverable herein, and because neither pleadings nor proof show any actual damages.

We do not regard the suit of appellee to be one for damages for loss of credit alone. It is one based upon the bond obligation and on tort for loss of the value of the oil lease resulting from wrongful garnishment impounding all of the resources and assets of appellee, and in stopping, interfering with and preventing the financing and developing of the lease under a contract then existing to develop it, and causing the lapsing or loss of the lease under the 60-day drilling clause of the lease contract. The damages thus sought to be recovered are special actual damages.

Other propositions of appellants as to their non-liability for the $1,000,000 damages resulting from the lapsing or loss of the oil lease are sustained. They are in substance:

1. That since the 1,200-acre oil lease was in the name of the Ohio Goodyear Sureties Company, and not in the name of appellee, and since it was neither alleged nor proved that appellant Commonwealth and its officials and attorney who procured the garnishment knew that appellee claimed to own the lease, or as to any matter concerning its development, the damages resulting from its loss did not result as the direct and immediate consequence of the wrongful acts complained of, and such damages are speculative and too remote.

2. That the damages for the loss of the oil lease are in the nature of special damages, and are not supported by either pleadings or proof giving rise thereto or notice thereof to appellants.

3. That the damages for the loss of the oil lease are due to independent intervening causes and agencies, and are therefore not recoverable because speculative and too remote.

It was neither alleged nor proved that appellant Commonwealth, or its officials and attorney who procured the garnishment, knew that the oil lease in the name of the Ohio Goodyear Securities Company was owned by appellee individually; nor that the terms of this oil lease required him to drill within 60 days; nor that appellee had some sort of arrangement with Rutherford Drilling Company for the drilling of the lease; nor that the Rutherford Company relied upon the garnished stock of appellee in the United Company to secure or to pay for the drilling of the well; nor that the lease would be lost if the well were not drilled. Appellee concedes that the pleadings and evidence do not so aver and prove, but contends that since his suit is one for an aggravated tort, the wrongdoer was responsible for any direct and immediate consequences of the wilful acts, regardless of whether they might have been contemplated, foreseen, or expected; and that under this rule appellee was entitled to recover the $1,000,000 for the loss of the oil lease when it was shown that: "The State and its agents knew that Mr. Davis owned eighty per cent of the stock of the United North and South; that he was engaged in developing oil fields. They must have known, at least should have been charged with notice, that, being in this business, he had leased lands for oil developing purposes; that such leases usually and generally carried a clause requiring development, and that the failure to comply with these provisions would cause him to forfeit his leases. It is a matter of common knowledge that the seizure of all

558

of an oil man's assets is usually attended by stoppage of development of his properties."

Manifestly these assumptions of facts and common knowledge will not suffice for proof necessary to show that such damages could be reasonably anticipated as the direct and immediate consequences of the wrongful acts complained of. This is true aside from the question of defective pleadings referred to, or from any question of the foreseeableness of the damages as the result of the wrongful acts complained of.

We regard the case of Texas & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S.W. 162, cited and relied on by appellee, as being authority for our conclusions. See also Giraud v. Moore, 86 Tex. 675, 26 S.W. 945; Olivares v. Garcia, 127 Tex. 112, 91 S.W.2d 1059, and Garner v. Crawford, Tex.Civ. App., 22 S.W.2d 975.

In the Bigham case [90 Tex. 223, 38 S.W. 164] it was held that although the "primary cause may be the proximate cause" of the injury through successive agencies or instruments, still the test of liability for a "wanton wrong" is "whether a reasonably prudent man, in view of all the facts, would have anticipated the result,—not necessarily the precise actual injury, but some like injury, produced by similar intervening agencies."

No reasonably prudent man could have anticipated the happening of the combination of events which resulted in the lapsing or loss of the 1,200-acre oil lease as the result of the wrongful garnishment of the stock owned by appellee in the United corporation; nor could he have anticipated that the $1,000,000 damages found by the jury would result as the direct and immediate consequences of the wrongful garnishment of the stock. The legal title to the oil lease was in the Ohio Goodyear Sureties Company, which was an Ohio corporation with no permit to do business in Texas, and which could not have developed the lease. If it had been in the name of appellee, or if appellant Commonwealth and its attorney and officers who procured the writ of garnishment had had notice that appellee was in fact the owner of the lease, then in either event it would have been subject to execution and could have been levied upon in satisfaction of the judgment. They had no notice of these facts, and in the language of the Bigham case "nothing short of prophetic ken could have anticipated," in absence of some sort of notice, that the issuance and service of the wrongful garnishment writ, impounding the stock of appellee in the United corporation, a wholly different corporation, and a wholly disconnected transaction, would cause Rutherford Drilling Company to refuse to carry out an oral contract with the representative of appellee and the United Company to drill an offset well on the 1,200-acre lease, and under its terms, in the event a well on an undescribed adjoining tract of land was completed a producer of oil or gas in paying quantities, and within 60 days thereafter; nor that such lease contract with the Ohio corporation provided that unless the offset well were so drilled the lease contract would become void and the lease would lapse. Nor could appellants have anticipated that the drilling company, which had no agreement of any character that the impounded stock would be used to secure payment of drilling the well, would refuse to drill the well merely because it feared that the garnishment of the stock would ultimately result in the change of the management of the wholly disconnected garnishee United Company, and in consequence might ultimately impair the assets and financial ability of appellee to carry out his contract. It is manifest from the facts and circumstances stated that the happening of the events which resulted in the lapsing or loss of the lease could not have been anticipated as the result of the wrongful garnishment, and that the $1,000,000 damages found by the jury to have resulted from the loss of the lease are not the direct and immediate consequences of the wrongful garnishment, and such damages are speculative and too remote. The law is settled that "the question of remoteness of damage is one of law to be decided by the court," and not by the jury. Brandon v. Gulf City Cotton Press Co., 51 Tex. 121.

The damages for the loss of the oil lease are also in the nature of special damages, and are not supported by either pleadings or proof giving rise thereto or notice thereof to appellants. They do not arise directly from the service of the wrongful garnishment writ impounding the stock, because the writ in no way applies to the oil lease itself. They are consequential and arise from the alleged happening of a combination of events, and from successive and independent agencies and instruments as the result of the wrongful garnishment, and are therefore special damages, and not supported, under our hereinabove analysis of the pleadings and evi-

dence, by either pleadings or proof giving rise thereto or notice thereof to appellants. Stafford v. Patterson & Nelson, ·Tex.Civ. App., 184 S.W. 1095; Reynolds v. Sandel, Tex.Civ.App., 142 S.W.2d 527; Taylor Bros. Jewelry Co. v. Kelley, Tex.Civ.App., 189 S.W. 340; Hamlett v. Coates, Tex.Civ.App., 182 S.W. 1144; Wilson v. Manning, Tex. Civ.App., 35 S.W. 1079.

The damages for the loss of the oil lease are also due to the happening of the several events, independent agencies, contracts and instruments as hereinabove detailed, which do not constitute a continuous succession of events so linked together as to make a natural whole, or from which the damages for the loss of the oil lease were the natural and probable consequence of the wrongful garnishment.

With respect to the other phase of the case, relating to the item of $550,000 damages for depreciation in the actual value of the stock impounded by the wrongful garnishment proceeding: The cause of action for wrongful garnishment as submitted to the jury is based upon the bond obligation to pay damages therefor and upon tort, which arose directly from the service of the wrongful garnishment writ impounding the stock of appellee. He alleged, offered proof tending to show, and the jury found: (1) That the actual value of the impounded stock was materially depreciated by cessation of development on the Matagorda County, Texas properties of the United Company, garnishee; (2) that the cessation of development and consequent depreciation in the value of the stock was proximately caused by the suing out and continuing in effect of the writ of garnishment; and (3) that the depreciation in the actual value of the stock was $550,000. Judgment was accordingly rendered for appellee for this item of damages.

In substance, appellants contend that the damages for depreciation in the value of the stock arise out of loss of credit recoverable only as exemplary damages; or relate to loss of profits neither plead nor proved; or relate to special damages, notice of which to appellants was neither plead nor proved; or relate to speculative and remote damages not resulting from any direct and immediate consequence of the wrongful garnishment.

Neither of these contentions is sustained, and the portion of the judgment awarding this item of $550,000 damages for depreciation in the actual value of the stock is affirmed.

The facts pleaded and supported by evidence are in substance:

Appellee Davis has been for a number of years engaged in the business of producing oil and gas and from which business he had made a large personal fortune. With the exception of the 1,200-acre oil lease in suit, his oil business had been carried on through "the vehicle" of two corporations, the United North & South Oil Company and the United North & South Development Company, garnishee, the latter being the successor to the unsold properties of the first named corporation. Appellee owned· more than 80% of the stock of each of these corporations, and the income tax judgment sued on was based on the personal income of appellee, derived through his ownership of such stock, and which facts were known to appellant Commonwealth and its attorney and officials who instituted this suit on the tax judgment and procured the wrongful writ of garnishment. Through his ownership of 186,751 of the 200,000 shares of the stock of the garnishee corporation, appellee controlled and personally managed its business and finances, and appointed all of its officers and employes. He personally financed or arranged the financing of the entire business affairs of the corporation, using his stock therein as collateral for loans to develop its oil properties when necessary. The completion of the Stoddard A–1 well which extended the United Company's Buckeye field 3½ miles and greatly enhanced the value of its properties, and in consequence greatly enhanced the actual value of the stock of appellee, was in part personally financed by him. It does not appear that he held his stock for sale for profit, and the only use made of the stock was to collect dividends thereon and to use some of it as collateral to secure loans with which to develop the properties of garnishee company, and some 85,000 shares of the stock were so used at the time of the garnishment.

After the completion of the Stoddard A–1 well, extending the Buckeye field 3½ miles, appellee and the officials appointed by him as representatives of the garnishee corporation planned and entered into a contract for the orderly development of these proven oil bearing properties. One well was to be drilled each thirty days or six weeks, the parties intending to drill from eight to twelve wells per year, and to thus fully develop the properties within· the. extended proven field. The proposed wells

were to have been drilled by the Rutherford Drilling Company, which company had drilled the Stoddard A–1 well and another well for the garnishee corporation in this field. Rutherford's representative testified that the contract was not carried out because the stock of appellee had been tied up by the garnishment writ; that he relied upon the management of the garnishee corporation by appellee to carry out the contract, and feared that the sale of the stock under the garnishment proceeding would change the management of the properties on which the wells were to be drilled. Appellee testified that the proposed plan of development of the properties could not be carried out, because the impounding of his stock, which was practically all the assets or collateral owned by him, prevented him from financing the drilling of the properties and caused the stoppage and cessation of their development. An officer of the garnishee corporation testified to the same effect. He further testified that the impounding of the stock of appellee by the garnishment resulted in the prevention of at least eight wells, and probably twelve wells per year for the two-year period; that each well would have added from $100,000 to $150,000 to the value of the garnishee's property, and in consequence would have added to the actual value of appellee's stock, because its value would necessarily increase as the value of the garnishee corporation's properties increased through development. Other evidence was to the effect that for the two-year period from the time of the service of the writ of garnishment to the trial of the case the drilling of the minimum of sixteen wells would have increased the value of the properties approximately $1,-600,000, and if twenty-four wells had been drilled the value would have increased approximately $2,400,000, and would proportionately to the amount of appellee's stock increase its actual value. In addition, the stoppage or cessation of development of the properties, on the basis of sixteen wells for the two-year period, was estimated to have resulted in the loss of approximately $5,000,000 in oil which could have been produced from the wells if the garnishment had not prevented their being drilled.

Another witness testified that the books of garnishee corporation showed that shortly prior to the time the stock was impounded by the garnishment some stock was sold at $20 per share, and that after the service of the garnishment some of the stock sold for $5 or $6 less per share; which facts the jury had the right to consider in determining whether the cessation of development and consequent depreciation in the "actual value", as distinguished from the market value of the stock, was proximately caused by the wrongful impounding of the stock through garnishment.

Thus the pleadings and proof show that the suit of appellee was not one for loss of credit, or loss of profits in business, or in profits from sale of the stock. It was one for damages for the depreciation in the actual value of appellee's stock due to cessation of the development of the proven oil properties of the garnishee corporation, which development would have increased the value of the properties, and in consequence have increased the actual value of the stock of appellee, and such damages to the actual value of the stock were the direct and immediate consequence of the impounding of the stock by the wrongful garnishment proceeding and continuing same in force.

In support of their contentions, appellants cite in particular the cases of Giraud v. Moore, 86 Tex. 675, 26 S.W. 945; Traweek v. Martin-Brown Co., 79 Tex. 460, 14 S.W. 564; Farmers & Merchants Nat. Bank v. Williams, 133 Tex. 554, 129 S.W.2d 268.

In the Giraud case it was held that where a garnishment is merely wrongful, and not vexatious or malicious, compensatory damages cannot be recovered by the holder of stock in a corporation unless it is shown that the garnishment caused depreciation in the value, or that the holder could or would have sold the stock during its detention for a profit. A recovery was denied because the suit was one solely for loss of profits of sale, and because it was not shown that a sale could have been made showing a profit but for the wrongful garnishment. This is not the point involved here. It is the other rule stated in the Giraud case that recovery may be had when the wrongful garnishment caused depreciation in the value of the stock, that is here involved. In this respect the Giraud case is authority for our conclusions, because in the instant case the suit was one for damages for depreciation in the actual value of the stock wrongfully impounded by the garnishment, which caused cessa-

tion of the development of the oil properties, and in consequence resulted in depreciation of the actual value of the stock.

■ The other two cases cited by appellants are not in point, because each involves damages for wrongful attachment of real property, which did not disturb the use or possession of it. The courts held that since there was no change in the use or possession of the attached property, no damages could be recovered unless it were shown that the owners could have sold the property during the time it was subject to the attachment for a profit. In the instant case the impounding of the stock by garnishment did deprive appellee of its use, because our statute, Art. 4084, prohibits the sale or transfer of stock of a corporation impounded by garnishment, and provides that any sale or transfer of the stock is void. This is true even though the officer serving the writ does not in fact take possession of the stock, because the courts hold that under such a statute, the writ is still in force and effect, notwithstanding the writ has been quashed, and notwithstanding an appeal is taken on cost bond from the order quashing it, and although no supersedeas bond is filed. Mackenzie v. A. Engelhard & Sons Co., 266 U.S. 131, 139, 45 S.Ct. 68, 69 L.Ed. 205, 36 A.L.R. 416. By the service of and continuing in force of the writ of garnishment, appellee has been deprived of the use of his stock in financing the development of the property which would have made the stock valuable, and the garnishment caused the stoppage or cessation of the development contracted for because those interested feared change in management of the corporation. As a practical proposition no one would contract liability of any sort with reference to stock of a corporation impounded by garnishment. The stock of appellee represented the overwhelming control of the corporation, and constituted the method by which appellee managed the affairs of the corporation and appointed its officers and employes. The seizure of this stock constituted a threat to immediately change the control and management of the corporation; and the service of the writ of garnishment stopped the development of the field, and in consequence caused the depreciation in value of the stock.

■ The contentions that the damages for depreciation in the actual value of the impounded stock are in fact damages for loss of credit or loss of profits and recoverable only as exemplary damages are not sustained. The are actual damages to the value of the stock during the time of its unlawful detention, and result as the natural and probable consequence of the wrongful detention of the stock. The damages for depreciation in the actual value of the wrongfully impounded stock are clearly the sort of damages which the Giraud case holds can be caused by wrongful garnishment of stock, where direct and positive proof shows the damages as it does in the instant case.

■ Nor are the damages for depreciation in the actual value of the stock special or remote damages in the sense that special pleadings and proof of notice to appellants thereof are necessary. Such damages are actual damages to the wrongfully impounded property and result as the natural and probable consequence of the wrongful detention of the stock, and appellee both alleged and offered proof tending to show that the wrongful garnishment of the stock deprived him of the use of it in financing the development of the oil properties which gave the stock value, and caused a threat to the continuity of the management of the properties, and resulted in the stoppage and tying up of the development then arranged for and actually in progress. Such damages are no more speculative or remote than are damages for loss of profit from the loss of sale of stock during detention under wrongful garnishment. The Giraud and all other cases on the point clearly hold that damages for loss of profit may be recovered under pleading and proof that the stock could and would have been sold for a profit but for the wrongful garnishment, and although the party who secured the wrongful garnishment did not know of such contemplated or possible sale of the impounded stock. No possible distinction can be made in the fact that the owner of stock owns and holds it for sale for profit and in the fact that he hold it for use in the financing of the business which makes the stock valuable, or any other business. Both uses are common uses made of stock, and wrongful garnishment which interferes with, interrupts, or deprives the owner of either use of his stock is actionable, and damages for loss of profits of sale, or for depreciation in the

actual value of the stock which may arise as the natural and probable consequence of the wrongful garnishment of the stock are recoverable. It would indeed be a harsh rule that would require the owner, who has been deprived of any use he may make of his private personal property, to show that the wrongdoer knew, or should have known, that he used it for a specific purpose before he could recover damages for having been wrongfully deprived of the use actually made of the property. In most instances notice of the actual use made of stock of a corporation by the owner to one who wrongfully impounds it by garnishment would be impossible, and in consequence the rule is that the wrongdoer must respond for any damages to the stock, or which result as the natural and probable consequence of the wrongful garnishment of the stock.

■■ We are also of the view that even if the damages for depreciation in the actual value of the stock, which resulted from the stoppage or cessation of the development of the oil properties and in consequence damaged the value of the stock, are in part in the nature of loss of credit or loss of profits, or are based in part on loss of credit or profits, they are nevertheless recoverable. The garnishment of the stock amounts to a seizure of it under our statute, depriving appellee of its use, and causing the stoppage and cessation of development then arranged for and in progress which would have increased the actual value of the stock and the dividends thereon from oil from the wells that were prevented from being drilled under the arrangements. Such facts are analogous to and bring the case within the established rule that where wrongful attachment or garnishment results in depriving the defendant of the use of property or the closing up of his business, he is "entitled to the actual damages he sustained in his credit, and in the closing up of his business, by the levy of the attachment." Mayfield v. Cotton, 21 Tex. 1, 4; Clardy v. Callicoate, 24 Tex. 170, 173; Kauffman v. Babcock, 67 Tex. 241, 2 S.W. 878; Jordan v. David, 20 Tex. 712; Cloud v. Smith, 1 Tex. 611; Hamlett v. Coates, Tex.Civ. App., 182 S.W. 1144; Wilson v. Manning, Tex.Civ.App., 35 S.W. 1079.

■ The item of $550,000 for damages for the depreciation in the actual value of the stock is recoverable under the original bond obligation as against the sureties thereon, and the fact that the suit of appellee is also based on tort for reckless and malicious garnishment is not material. And as to appellant Commonwealth the right of action on the bond obligation for wrongful garnishment was expressly ratified and confirmed by the "Resolve" of the Massachusetts Legislature.

Under our above conclusions the judgment for $1,000,000 damages for loss of the oil lease is reversed and judgment is here rendered that appellee take nothing as to this item of damages. We affirm the judgment of the trial court giving full faith and credit to the Massachusetts tax judgment sued on and rendering judgment for the full amount of said judgment debt with interest. We also affirm the judgment of the trial court awarding appellee $550,000 as damages for depreciation in the actual value of the stock with interest, and direct that this amount be offset or credited on the Massachusetts tax judgment sued on, and that judgment be here rendered for appellant Commonwealth for the balance due on the tax judgment. Having allowed the item of $550,000 damages as an offset or credit on the Massachusetts tax judgment, which fully satisfies the liability of the sureties on the garnishment bond therefor, there is no need to render specific judgment against the sureties therefor, although we hold the sureties liable for such damages.

Our above conclusions render immaterial many propositions urged by both appellant Commonwealth and the sureties as to nonliability for the $1,000,000 damages for loss of the oil lease. We have also carefully examined their several propositions relating to alleged practice errors which would merely require a reversal of the case, and find them to be without merit.

The judgment of the trial court is accordingly affirmed in part and in part reversed and rendered, and as thus reformed the judgment is rendered in favor of the Commonwealth for the balance due on its tax judgment.

Affirmed in part and in part reversed and rendered.